**OREGON NATURAL RESOURCES COUNCIL; Breitenbush Community, Inc.; Michael Donnelly, Plaintiffs-Appellants,**

v.

**U.S. FOREST SERVICE; Bugaboo Timber Company, Defendants-Appellees.**

No. 87–3737.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 7, 1987.

Decided Dec. 21, 1987.

Ralph Bradley, Eugene, Or., for plaintiffs-appellants.

Blake A. Watson, Dept. of Justice, Washington, D.C., and John F. Neupert, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., for defendants-appellees.

Victor M. Sher and Todd D. True, Seattle, Wash., for amicus curiae Sierra Club, Inc. and The Wilderness Society.

Before GOODWIN and FERGUSON, Circuit Judges, and STEPHENS, District Judge.[*]

FERGUSON, Circuit Judge:

Plaintiffs-appellants Oregon Natural Resources Council, Inc. ("ONRC"), Breitenbush Community, Inc., and Michael Donnelly appeal the district court's denial of their motion for summary judgment and motion for preliminary injunction. The plaintiffs also appeal the court's order granting summary judgment for defendants-appellees United States Forest Service ("USFS") and Bugaboo Timber Co. ("Bugaboo"). Plaintiffs seek to enjoin Bugaboo from harvesting timber pursuant to a timber sale awarded Bugaboo by the USFS. We affirm in part and reverse in part.

Plaintiffs raise three issues on appeal. First, plaintiffs claim that the USFS violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, because the USFS did not abide by its own regulations and improperly dismissed plaintiffs' administrative appeal concerning the USFS's Environmental Assessment ("EA") of the

[*] Honorable Albert Lee Stephens, Jr., Senior United States District Judge, Central District of California, sitting by designation.

North Roaring Devil timber sale. Second, plaintiffs claim that the EA is inadequate under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, because it does not address cumulative effects, because it does not disclose violations of state water quality standards, and because the sale is precluded by a separate Draft EIS on the Northern Spotted Owl. Third, plaintiffs argue that construction of a bridge and logging road will violate the Federal Clean Water Act ("CWA"), 33 U.S.C. § 1251, and Oregon water quality standards enforceable under the Clean Water Act.

## I.

In 1977, the USFS adopted a final programmatic Environmental Impact Statement ("EIS") on Multiple Use Land Management and Time Management Plans for Willamette National Forest. The EIS divided the forest into five planning units, one of which, the North Santiam Planning Unit, contains the North Roaring Devil timber sale, the subject of this lawsuit. In 1980, the USFS completed an EA for the North Roaring Devil timber sale and made a Finding of No Significant Impact ("FONSI"). No administrative challenge was made at that time. In 1981, the USFS sold the North Roaring Devil timber to a private company. However, no harvesting took place and the sale was later returned by the buyer to the USFS in accordance with the Federal Timber Contract Payment Modification Act of 1984 ("FTCPMA"), 16 U.S.C. § 618 et seq. Pursuant to the FTCPMA, the USFS modified and reoffered the sale on December 5, 1985.

On January 20, 1986, the plaintiffs sought to appeal the reoffer pursuant to USFS regulations, which state that "[d]ecisions of Forest Officers concerning the National Forest System ... are subject to appeal." 36 C.F.R. § 211.18(a)(1). The USFS dismissed the appeal, claiming that it was untimely because it was not filed within forty-five days of the *original* decision to sell the timber, made on September 29, 1980. *See* 36 C.F.R. § 211.18(c)(1). Thereafter, the USFS awarded the timber sale to

Bugaboo on October 1, 1986. On October 20, 1986, plaintiffs sought to appeal the award of the resale. The USFS again dismissed the appeal as untimely.

The present action was filed on October 21, 1986. The winter months prevented the timber company from taking further action. On January 7, 1987, plaintiffs filed a motion to amend their complaint to include a NEPA claim and a claim under the Endangered Species Act, 16 U.S.C. § 1536(c)(1), concerning the Northern Spotted Owl. The district court temporarily denied the amendment. On March 26, 1987, the court allowed the amendment after it segregated the issues for discovery and trial at a later date. On May 7, 1987, the district court issued an opinion denying plaintiffs' motions for summary judgment and injunctive relief and granting summary judgment for defendants, 659 F.Supp. 1441. Plaintiffs timely appeal.

## II.

We review de novo the district court's grant of summary judgment. *Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986). We must decide, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

We will reverse the grant or denial of a preliminary injunction only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849 (9th Cir.1985).

## III.

Plaintiffs argue that the reoffer of the North Roaring Devil timber sale constitutes a "decision" by the USFS which is subject to administrative appeal. The regulations upon which plaintiffs rely state that "[d]ecisions of Forest Officers concerning the National Forest System ... are subject to appeal." 36 C.F.R. § 211.18(a)(1). The USFS dismissed plain-

tiffs' appeal of the reoffer on the grounds that the appeal was untimely. The USFS contends that the original decision concerning the sale was made on September 29, 1980, and that the reoffer merely implemented this decision and did not constitute a separate decision within the meaning of 36 C.F.R. § 211.18. Since plaintiffs failed to appeal the original decision in a timely manner, *see id.* § 211.18(c)(1), the USFS dismissed the later appeal. The district court, after examining the FTC–PMA, agreed with the USFS.

The FTCPMA provides that:

Timber from returned or defaulted contracts shall be offered for resale in an orderly fashion.... Timber from returned or defaulted contracts shall be given preference in the Forest Service timber sales programs.[1]

16 U.S.C. § 618(a)(5)(A).

The district court concluded that in providing for priority reoffers of timber from returned contracts, Congress did not contemplate full review of the earlier decision to sell the timber. Thus, the court concluded that "the reoffer of the North Roaring Devil sale does not constitute a 'decision' within the meaning of 36 C.F.R. § 211.18(a)(1) and USFS did not violate its regulations when it dismissed the appeal as untimely."

Plaintiffs assert, however, that although Congress intended that the USFS move expeditiously to reoffer returned sales, it did not withdraw discretion from the agency to modify or withdraw such sales in appropriate circumstances. According to plaintiffs, the USFS must make a "decision" for each returned sale to determine whether to reoffer the sale and to determine the terms of the reoffer.

Plaintiffs refer to section 320 of the Department of the Interior and Related Agencies Appropriation Act, Pub.L. 99–591, 100 Stat. 3341–287, which was signed into law on October 30, 1986, to buttress their argument. Following passage of the FTCPMA, a controversy existed concerning the nature of administrative review Congress intended to allow for the reoffered sales. In response to this controversy, the Committee on Appropriations recommended that returned or defaulted sales which complied with existing environmental and other statutes and standards at the time of the original sale should "not be subject to further administrative or judicial appeal or review." S.Rep. No. 397, 99th Cong., 2d Sess. 66 (1986). The Conference Committee that prepared the final enacted version of the provision rejected this language. Instead, the Committee adopted the following:

To assure that National Forest and Bureau of Land Management timber included in sales defaulted by the purchaser, or returned under the Federal Timber Contract Payment Modification Act (Public Law 98–478), is available for resale in a timely manner, *such sales shall be subject only to one level of administrative appeal.* This limitation shall not abridge the right of judicial review. Actions on such administrative appeals should be completed within 90 days of receipt of the notice of appeal. Sales that are reoffered shall be modified, including minor additions or deletions, as appropriate, to reduce adverse environmental impacts, pursuant to current land management

**1.** The legislative history of this provision states: Subparagraph (5)(A) provides that timber from returned or defaulted contracts be given preference for resale in the agency timber sale programs. The intent of this provision is that where other factors are similar, the agencies should offer returned or defaulted timber first before offering new sales. From an economic point of view, these sales should be offered first because of cost savings to the government. They have already received extensive study of such matters as boundaries, rights of way and environmental factors; timber volume and sale designs have already

been surveyed, and personnel have already administered the sale. Reoffered sales, however, should be reviewed and updated in order that any newer environmental standards can be taken into account. It is also anticipated that the agency may combine or otherwise realign some returned sales, such as those which have already been partially operated, and that some sales may not be reoffered at all due to some changed condition.
S.Rep. 596, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin.News 3796, 3814, 3815.

plans and guidelines, and *such modifications in themselves should not be construed to require the preparations of new or supplemental environmental assessments.*

Pub.L. No. 99–591, § 320, 100 Stat. 3341–287 (Oct. 30, 1986) (emphasis added).

Plaintiffs contend that the change from the original Senate language to the final statutory text makes it clear that Congress intended to abbreviate the administrative review of reoffered sales.[2] Based on this language, the district court concluded that Congress did not intend to "mandate a review of the scope and breadth for which plaintiffs have contended."

The district court further concluded that, even if Congress intended to mandate one level of administrative appeal, Congress did not intend section 320 to apply retroactively. Section 320 was enacted on October 30, 1986, twenty-nine days after the North Roaring Devil timber sale was awarded. The court also noted that the modification made by the USFS on December 4, 1985, after the sale was returned but before it was reoffered, reduced the amount of timber to be cut, and reduced the impacts to the Spotted Owl management area without adding any new land to the sale. The court concluded that it would be inappropriate to entertain a full-scale appeal of plaintiffs' claims when all the modifications appeared to be beneficial to plaintiffs.

■ We conclude that the regulations, and the statutory language of section 320 and its legislative history, support plaintiffs' position. The *reoffer* by the USFS of a returned timber sale is a decision within the meaning of 36 C.F.R. § 211.18(f)(1), which provides for administrative appeals. The legislative history of the FTCPMA reveals that a reoffer requires the exercise of

discretionary judgment and, thus, a decision by the USFS.

We do not apply section 320 retroactively. Section 320 and its legislative history disclose that Congress was aware of existing administrative rights under the regulations. Section 320 acted as a limitation on these rights. Since neither the FTCPMA nor section 320 specifically withdrew the rights but only limited them, we agree with plaintiffs that they are entitled to the administrative appeals set forth in the regulations.[3]

■ Finally, the district court's conclusion that the 1985 modification was favorable to plaintiffs is irrelevant in deciding plaintiffs' claim that they are entitled to an administrative appeal of the reoffer. If the USFS determines that plaintiffs' claims lack merit, it may so decide. However, the procedural question presented here is a separate issue. We therefore reverse the district court's decision and direct that the case be remanded to the USFS for proper administrative review.

## IV.

Upon reaching the merits, the district court ruled that the programmatic EIS and the EA satisfied the NEPA. On appeal, plaintiffs argue that defendants have not adequately considered cumulative impacts from other sales. Plaintiffs also argue that the EA fails to consider cumulative impacts from the adjacent Craig Timber Sale and that the EA fails to disclose violations of Oregon water quality standards. Defendants allege that the plaintiffs are barred by collateral estoppel from challenging the EA. The district court did not address this issue. Although mischaracter-

---

**2.** The legislative history of section 320 adds additional support to plaintiffs' argument. The Committee report states:

The managers have agreed to include modified Senate language which *limits* administrative appeals to one level of appeal on *all* returned or defaulted timber sales within the Forest Service and Bureau of Land Management.

H.R.Rep. No. 1002, 99th Cong., 2d Sess. 77 (emphasis added). The use of the term "limits"

suggests that Congress believed that the ordinary number of administrative appeals, as set forth in 36 C.F.R. § 211.18(f), applied to timber resales.

**3.** Of course, all reoffers of timber sales made after October 30, 1986, are entitled to only one level of administrative appeal. *See* Pub.L. No. 99–591, § 320, 100 Stat. 3341–287 (Oct. 30, 1986).

ized as collateral estoppel, we find defendants' argument meritorious.

The USFS first prepared an EA on the North Roaring Devil timber sale in 1980 and sold the timber in 1981. There was a specified period during which plaintiffs, or any other interested individuals or organizations, could have challenged the EA. No challenge was made. Essentially, defendants contend that plaintiffs had a full and fair opportunity to challenge the manner in which the USFS fulfilled its NEPA obligations and, since plaintiffs failed to challenge the EA then, they should not be permitted to challenge it now.

■ Insofar as plaintiffs challenge the EA without referring to changed circumstances which may have occurred during the five years or without alleging environmentally significant modifications the USFS made after the timber sale was returned, the defendants' position is legitimate. Plaintiffs should not be allowed a second chance at administrative and judicial review when they failed timely to appeal the original EA.

As stated above, however, plaintiffs are entitled to the administrative appeals set forth in the regulations. If the USFS finds that the EA was not previously challenged and that plaintiffs are time-barred from challenging it because they fail to allege changed circumstances or environmentally significant modifications not addressed earlier, the USFS may so rule in rejecting plaintiffs claims. Until that time, the court cannot review the adequacy of the EA or defendants' argument that plaintiffs are time-barred from raising the issue. Thus, we vacate that portion of the district court's opinion that addresses plaintiffs' NEPA claims.

4. The amended complaint alleged that the USFS was in the process of considering a separate EIS on the impacts of harvesting on the Northern Spotted Owl. The EIS included an alternative prohibiting timber harvesting in all suitable Spotted Owl habitats. The EA at issue in this case recognizes that the North Roaring Devil timber area is suitable Spotted Owl habitat. Plaintiffs allege that two Spotted Owls live in the timber area.

V.

The district court did not address the question of whether the USFS violated NEPA by permitting logging in an area which presently is under consideration for protection as a Spotted Owl habitat. Plaintiffs' original complaint did not allege a Spotted Owl claim under NEPA or the Endangered Species Act, 16 U.S.C. § 1536(c)(1). On January 9, 1987, the plaintiffs filed a motion to amend their complaint to include the Spotted Owl claims.[4] On January 30, 1987, the district court temporarily denied plaintiffs' motion to amend the complaint, indicating that if the claims were allowed, they would be segregated. On March 26, 1987, the court allowed the filing of the amended complaint, but segregated the issues for discovery and trial at a later date. See Fed.R.Civ.P. 42(b).

■ Plaintiffs contend that the district court erred in refusing to consider the Spotted Owl claim prior to the initiation of the timber harvesting. Plaintiffs claim that the district court's segregation of the Spotted Owl claims effectively condones the USFS's violation of the Council on Environmental Quality (CEQ) regulations.[5]

The applicable regulation states that before a final decision is made on an EIS (the Spotted Owl EIS in this case), "no action concerning the proposal shall be taken which would ... [l]imit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(2). Plaintiffs argue that the USFS's decision to proceed with the timber sale effectively limits the reasonable alternatives set forth in the Spotted Owl EIS before the USFS has made its final decision on that EIS. Plaintiffs claim that the district court's decision sanctions such a limitation and is therefore erroneous.

5. By Executive Order, the CEQ issued regulations to federal agencies for implementing NEPA. Exec.Order No. 11991, 42 Fed.Reg. 26,967–68 (1977). The CEQ regulations are binding on all federal agencies and provide guidance to the courts for interpreting NEPA requirements. 43 Fed.Reg. 55,978 (1978).

This court reviews the district court's decision to segregate a claim for abuse of discretion. *See Airlift Int'l, Inc., v. McDonnell Douglas Corp.*, 685 F.2d 267, 269 (9th Cir.1982).

We find that the district court did not abuse its discretion in segregating the Spotted Owl claim. Plaintiffs did not seek to amend their complaint until the hearing was close at hand. Plaintiffs do not allege that they were unaware of the Northern Spotted Owl up until that time or that relevant information concerning the Spotted Owl was obtainable only through discovery. Further, the plaintiffs ostensibly can challenge the adequacy of that EIS in a separate proceeding. We conclude, therefore, that despite the impact of the district court's decision, it was not improper, considering the late timing of plaintiffs' amended complaint.

## VI.

Plaintiffs allege that the road building and timber harvesting associated with the timber sale violate Oregon state water quality standards[6] and that the USFS's failure to comply with these standards violates section 1323 of the CWA. The CWA requires each state to develop and implement "water quality" standards to protect and enhance the quality of water within the state. 33 U.S.C. § 1313. The Act also requires all federal agencies to comply with all state requirements. 33 U.S.C. § 1323.

Plaintiffs claim that the district court erred when it concluded that plaintiffs could not bring a CWA action under section 1365 of the Act (the citizen suit provision) because they failed to provide a sixty-day notice. 33 U.S.C. § 1365(b)(1). Plaintiffs argue that their action is not brought pursuant to section 1365 but instead is brought

under the judicial review provision of the APA, 5 U.S.C. §§ 701–706, or, in the alternative, that they gave adequate notice under the CWA.

Defendants argue that plaintiffs failed to meet the sixty-day notice under the CWA citizen suit provision or, in the alternative, that plaintiffs are not entitled to bring an action under the CWA because the CWA permits citizen suit enforcement of state water quality standards *only* to the extent that the requirements are conditions of permits issued under the National Pollutant Discharge Elimination System ("NPDES") established under the Act, 33 U.S.C. § 1342. Because plaintiffs do not allege such violations, defendants state that plaintiffs are without a remedy under the Act.[7] Defendants further argue that the CWA provides an exclusive remedy and that plaintiffs cannot seek review under the APA for this type of agency action.

Before we decide whether plaintiffs must comply with the sixty-day notice requirement, we must first resolve the issue concerning whether plaintiffs have a cause of action under the citizen suit provision of the Act, and thus whether the sixty-day notice requirement is applicable. *See* 33 U.S.C. § 1365(b)(1). Initially, we must consider the language of the citizen suit provision. The provision states that any citizen may commence a civil action "against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a). Section 1365(f) defines "effluent standard or limitation" as "an unlawful act under subsection (a) of section 1311 ... [or] an effluent limitation or other limitation under section 1311 or 1312 of this title." Plaintiffs concede that section 1311(a) of the Act refers specifically to point source dis-

---

**6.** According to plaintiffs, defendants have violated and plan to violate the State of Oregon's Water Quality Standard for nondegradation, which provides that unless the Environmental Quality Commission grants an exemption, "existing high quality waters ... shall be maintained and protected." Or.Admin.R. 340–41–026(1)(a) (1986). Plaintiffs further allege violations of a rule proscribing activities in the Willamette Basin which "either alone or in combination with other wastes or activities will cause

... a 10 percent cumulative increase in natural stream turbidities." Or.Admin.R. 340–41–445(2)(c) (1986).

**7.** Indeed, plaintiffs state in their brief that "[t]he reason for using the APA is that the citizen suit provision arguably applies only to permit violations and not to water quality violations, such as those involved here."

charges,[8] which are not at issue in this case. Plaintiffs also concede that sections 1311(b)(1)(A) and (B) only apply to point sources.

We are asked, however, to examine section 1311(b)(1)(C), which lists additional enforceable standards, including state water quality standards. The provision states that in order to achieve the objectives of the Act there shall be achieved "any more stringent limitation including those necessary to meet water quality standards, treatment standards ... or any other Federal law or regulation, or required to implement *any applicable water quality standard established pursuant to this chapter.*" 33 U.S.C. § 1311(b)(1)(C) (emphasis added). It is plaintiffs' contention that because section 1311(b)(1)(C) incorporates state water quality standards established pursuant to section 1313 and does not explicitly refer to point sources, plaintiffs are entitled to sue under the citizen suit provision of the Act to enforce state water quality standards affected by nonpoint sources.[9]

We recognize that nonpoint sources of pollution constitute a major source of pollution in the nation's waters.[10] However, we do not believe that the Act allows for the enforcement of state water quality standards, as affected by nonpoint sources, un-der the citizen suit provision. When Congress established the National Pollutant Discharge Elimination System (NPDES) in 1972 and concomitantly created a new approach to regulating and abating water pollution, it drew a distinct line between point and nonpoint pollution sources. Point sources are subject to direct federal regulation and enforcement under the Act.[11] *See* 33 U.S.C. § 1342. Nonpoint sources, because of their very nature, are not regulated under the NPDES. Instead, Congress addressed nonpoint sources of pollution in a separate portion of the Act which encourages states to develop areawide waste treatment management plans.[12] *See* 33 U.S.C. § 1288. We do not agree with plaintiffs that Congress intended section 1311 to apply to nonpoint sources. Section 1311 of the Act is entitled "Effluent Limitations." 33 U.S.C. § 1311. Effluent limitations are defined as "any restriction established by a state or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from *point sources* into navigable waters." 33 U.S.C. § 1362(11) (emphasis added).

Three methods for deriving effluent limitations are identified in section 1311(b)(1). The first method is "application of the best practicable control technology currently

---

**8.** The term "point source" means "any discernible, confined and discrete conveyance, included but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

**9.** Nonpoint source pollution is not specifically defined in the Act, but is pollution that does not result from the "discharge" or "addition" of pollutants from a point source. Examples of nonpoint source pollution include runoff from irrigated agriculture and silvicultural activities. *See Trustees for Alaska v. Env'tl Protection Agency,* 749 F.2d 549, 558 (9th Cir.1984).

**10.** V. Novotny & G. Chesters, *Handbook of Nonpoint Pollution* 2 (1981) (asserting that nonpoint sources of pollution account for more than 50% of the total water quality problem).

**11.** The Act provides that, except under certain specified circumstances, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). A "discharge of a pollutant" is defined in part as "any addition of any pollutant to navigable waters from any *point source.*" 33 U.S.C. § 1362(12) (emphasis added).

**12.** Congress recently amended the Clean Water Act and added a new provision dealing with nonpoint sources of pollution which provides grants and assistance to states who develop programs to deal with nonpoint sources. *See* Water Quality Act of 1987, Pub.L. No. 100–4, § 316, 101 Stat. 52 (Feb. 4, 1987).

In the new amendments Congress also added the following language to section 1251(a) of the Act, which sets forth the goals and policies of Congress. The new language states that:

(7) it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of the Act to be met through the control of both point and nonpoint sources of pollution.

Pub.L. No. 100–4, § 316(b), 101 Stat. 60 (Feb. 4, 1987).

available." 33 U.S.C. § 1311(b)(1)(A). The second method is "secondary treatment as defined by the [EPA] Administrator." 33 U.S.C. § 1311(b)(1)(B). The third method includes "any more stringent limitation," including these necessary to meet state water quality standards. 33 U.S.C. § 1311(b)(1)(C). Thus, effluent limitations may be derived from state water quality standards and may be enforced when included in a discharger's permit. We agree with defendants that it is not the water quality standards themselves that are enforceable in section 1311(b)(1)(C), but it is the "limitations necessary to meet" those standards, or "required to implement" the standards.

The title and construction of section 1311(b)(1) lead us to the logical conclusion that the "limitations" set forth in section 1311(b)(1)(C) are "effluent limitations" and, therefore, by definition, applicable only to point sources. *See* 33 U.S.C. § 1362(11). Having reached this conclusion, we find that plaintiffs do not have a cause of action under the citizen suit provision of the CWA. Therefore, the required sixty-day notice under the Act is not applicable in this case.[13] The district court, therefore, erred in its conclusion that plaintiffs were subject to the notice requirement.

We next confront the issue concerning whether plaintiffs may enforce the alleged state water quality standard violations from nonpoint sources pursuant to the APA, 5 U.S.C. §§ 701–706. The APA· provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.[14] Two exceptions to

the general rule of reviewability are set out in the APA. Review is not available where "statutes preclude judicial review" or where "agency action is committed to agency discretion by law." 5 U.S.C. §§ 701(a)(1), (2).

The USFS concedes that APA review is appropriate for some types of final agency action that relate to the CWA. The USFS argues, however, that APA review is not appropriate when citizens attempt to *enforce* the CWA because Congress impliedly precluded judicial review under the APA when it enacted the citizen suit enforcement provision. The USFS argues that the Supreme Court's decision in *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), supports its contention.

In *Sea Clammers*, an organization whose members harvest fish and shell fish sued various governmental entities and officials from New York, New Jersey, and the federal government, seeking injunctive and other relief with respect to the dumping of sewage, sludge, and other waste into New York Harbor and the Hudson River. *Id.* at 4–5, 101 S.Ct. at 2618–19. The plaintiffs failed to give proper notice under section 1365(b)(2) of the CWA and were thereby prevented from bringing an action under that provision. 453 U.S. at 6, 101 S.Ct. at 2619. Plaintiffs thus attempted to proceed under an implied private right of action from the Act, *id.* at 13, 101 S.Ct. at 2622–23, or under the separate authority of 42 U.S.C. § 1983 to enforce alleged violations of the Act, 453 U.S. at 19, 101 S.Ct. at 2625–26.

The Supreme Court rejected plaintiffs' arguments, holding that an implied right of

---

**13.** Plaintiffs argue that this court previously has recognized the rights of citizens to enforce state water quality standards against the USFS. *See Northwest Indian Cemetery Protective Ass'n v. Block*, 795 F.2d 688, 697 (9th Cir.1986), *cert. granted*, 107 S.Ct. 1971 (1987). In *Northwest Indian Cemetery*, the State of California and private citizens brought suit against the USFS to enforce California Water quality standards and to enjoin the construction of a USFS road. However, neither the district court, *Northwest Indian*, 589 F.Supp. 921, 927 (C.D.Cal.1983), nor this

court, 795 F.2d 688, 697, addressed jurisdiction under the citizen suit provision of the CWA. The district court found that the Forest Service projects would violate the state standards, and this court reviewed the finding for clear error. *Id.*

**14.** The APA also provides for review of "agency action made reviewable by statute" and for review of "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704.

action did not exist and that Congress could not have intended to preserve the section 1983 right of action when it had created so many specific statutory remedies. *Id.* at 13–21, 101 S.Ct. at 2622–27. The USFS interprets *Sea Clammers* as standing for the proposition that the citizen suit provision is the exclusive means by which an individual may enforce the CWA.

We, however, do not interpret *Sea Clammers* so broadly. First, an implied right of action under a violated statute is not a necessary predicate to a right of action under the APA. *Chrysler Corp. v. Brown,* 441 U.S. 281, 317, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979); *Glacier Park Found. v. Watt,* 663 F.2d 882, 885 (9th Cir.1981). Second, we interpret *Sea Clammers* to stand for the proposition that section 1983 is not available to plaintiffs seeking to enforce limitations and standards they could enforce pursuant to the citizen suit provision of the Act. The Court concluded that "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." 453 U.S. at 20, 101 S.Ct. at 2626. In the instant case, plaintiffs are not attempting to enforce the Act pursuant to the citizen suit provision. As we stated earlier, plaintiffs cannot enforce state water quality standards with respect to nonpoint sources pursuant to that section because Congress did not so provide. Thus, plaintiffs have no exclusive and comprehensive remedy in the citizen suit provision of the Act, as did the plaintiffs in *Sea Clammers*. Further, *Sea Clammers* involved the availability of a damages remedy. *Id.* at 4, 101 S.Ct. at 2618. Our case is distinguishable because plaintiffs are not seeking damages available under the citizen suit provision. Plaintiffs are merely seeking a determination

that the timber harvesting violates the Oregon water quality standards.

Finally, in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), the Supreme Court held that "judicial review of final agency action by an aggrieved person will not be cut off unless there is a persuasive reason to believe that such specifically was the purpose of Congress." We conclude that by creating a section of the Act specifically addressing nonpoint sources Congress did not intend to cut off review, but intended to protect the interests of persons aggrieved by nonpoint source violations of state water quality standards.[15] Judicial review under the APA is therefore "ordinarily inferred" and appropriate. *See Barlow v. Collins,* 397 U.S. 159, 167, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970).

This decision should not be interpreted to suggest that plaintiffs seeking relief under the CWA may circumvent the notice requirement of the citizen suit provision by resorting to the APA. *See Allegheny County Sanitary Auth. v. United States Envtl. Protection Agency,* 732 F.2d 1167, 1177 (3d Cir.1984). Where plaintiffs may otherwise proceed under the citizen suit provision, they should not be allowed to bypass the explicit requirements of the Act established by Congress through resort to section 1983, *Sea Clammers,* 453 U.S. at 14–15, 101 S.Ct. at 2623–24, or the APA, *Allegheny County,* 732 F.2d at 1177.

Finally, our conclusion is in accord with previous Ninth Circuit opinions. In *Northwest Indian,* 795 F.2d at 697, this court allowed citizens to sue the USFS for violations of water quality standards. Although jurisdiction was not addressed on appeal or below, the district court stated that plaintiffs alleged violations of both the CWA and the APA. *Northwest Indian Cemetery Protective Ass'n v. Peterson,* 589 F.Supp. 921, 922 n. 1 (N.D.Cal.1983).

---

**15.** We note also that the "savings clause" in the citizen suit provision of the Act states that nothing in that provision "shall restrict any right which any person ... may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief." 33 U.S.C. § 1365(e). We are aware that the Supreme Court rejected the notion that this clause preserved an implied right of action from the statute. *Sea Clammers,* 453 U.S. at 15–16, 101 S.Ct. at 2623–24. However, we believe that the savings clause preserves rights created by a separate statute such as the APA.

For the reasons we expressed earlier concerning the unavailability of this type of action under the citizen suit provision of the CWA, we believe that the court's decision was based on the APA.[16]

This circuit's decision in *City of Las Vegas v. Clark County*, 755 F.2d 697 (9th Cir.1985), further supports our conclusion. The USFS implies that language in *City of Las Vegas* stating that *Sea Clammers* "precludes suits brought under 28 U.S.C. § 1331 and 42 U.S.C. § 1983," 755 F.2d at 703, necessarily means that suits brought pursuant to the APA and 28 U.S.C. § 1331 also are precluded. However, in *City of Las Vegas*, the court was interpreting the impact of *Sea Clammers* with respect to an implied right of action, *see* 453 U.S. at 15, 101 S.Ct. at 2623–24, and section 1983. Moreover, the court explicitly recognized that the district court may have had jurisdiction under 28 U.S.C. § 1331(a) to review the Environmental Protection Agency's action under the APA. *City of Las Vegas*, 755 F.2d at 704. We conclude, therefore, that judicial review is available under the APA.

The district court states that even if it were to consider the CWA claim on the merits, it would reject it. The court stated that it had considered the views of the witnesses regarding the impact of the clear cuts on the river and that while it recognized that activities associated with the timber harvest may cause discoloration and turbidity, these charges would be "minor and transient." The court therefore denied plaintiffs' request for injunctive relief.

The Oregon Water Quality Standards are more complicated than plaintiffs allege. For example, although the regulations require that existing high quality waters be maintained and protected, the regulations also set guidelines for nonpoint source activities. In particular, the regulations state that "[l]ogging and forest management activities shall be conducted in accordance with the Oregon Forest Practices Act so as to minimize adverse effects on water quality." Or.Admin.R. 340–41–026(7) (1986). The regulation to which plaintiffs refer concerning the ten percent cumulative increase in natural stream turbidities in the Willamette Basin also provides exceptions for "limited duration activities necessary to ... accommodate essential dredging, construction or other legitimate activities." Or.Admin.R. 340–41–445(2)(c). The regulation further states that the limited duration activities may be authorized provided that "all practicable turbidity control techniques have been applied" and a permit or certification authorized under sections 1341 and 1344 of the CWA or under Or.Admin.R. 141–85–100 *et seq.* has been issued.[17] Or. Admin.R. 340–41–445(2)(B) (1986).

■ We believe, however, that plaintiffs' allegations and the regulations may raise questions of material fact concerning whether the water quality standards of the Willamette Basin will be violated and whether defendants have obtained the necessary authorization. We therefore remand this issue to the district court for a determination on the merits of whether summary judgment is appropriate on the issue of whether the activities accompanying the timber harvest will violate the applicable regulations.

We do not express any opinion concerning whether or not the matters involved preclude APA review because the matters constitute agency actions committed to agency discretion by law.

### VII.

Defendant Bugaboo argues that plaintiffs' claim for injunctive relief is barred by the doctrines of laches and unclean hands. Bugaboo's argument concerning laches is meritless. Plaintiffs have timely pursued their claims. With respect to Bugaboo's charge that plaintiffs are guilty of unclean

---

**16.** The APA does not itself provide jurisdiction. *Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). Federal question jurisdiction is based on 28 U.S.C. § 1331. *Id.* at 107, 97 S.Ct. at 985; *Glacier Park Found. v. Watt*, 663 F.2d 882, 885 (1981).

**17.** Although a permit or certification may not be required for nonpoint source activities, other restrictions in the regulation may apply.

hands because they were engaged in disobedience at the site of the timber sale, the district court specifically found that Bugaboo failed to establish that any of the parties engaged in the demonstrations were plaintiffs' agents.

## VIII.

In conclusion, we find that plaintiffs' NEPA claims are entitled to the levels of administrative review set forth at 36 C.F.R. § 211.18(f). We therefore reverse the district court's holding on this issue and vacate its conclusions concerning the merits of the NEPA claim. The district court should grant appropriate injunctive relief while plaintiffs pursue their administrative remedies. We affirm the order segregating the "Spotted Owl" claim. We remand to the district court for a determination on the merits whether summary judgment is appropriate on the CWA claims brought under the judicial review provisions of the APA.

Plaintiffs' request for attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) is denied. Although we rule against the USFS on some of the claims, we cannot conclude that the government's position was not substantially justified. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1390 (9th Cir.1987). Each party shall bear its own costs.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART and REMANDED for further consideration in accordance with this opinion.