BLUE MOUNTAINS BIODIVERSITY
PROJECT; and Oregon Natural
Resources Council, Plaintiffs,

v.

F. Carl PENCE, in his official capacity as
Supervisor, Malheur National Forest;
and United States Forest Service, an
agency of the United States Department
of Agriculture, Defendants,

and

Malheur Lumber Company, an assumed
business name of Ochoco Lumber Co.,
an Oregon limited partnership; Malheur
Timber Operators, an Oregon nonprofit
corporation; and Northwest Forest Re-
sources Council, an Oregon nonprofit
corporation, Intervenor–Defendants.

No. Civ. 98–22–FR.

United States District Court,
D. Oregon.

Sept. 21, 1998.

eur Timber Operators, and Northwest Forest Resources Council to intervene as defendants.

The plaintiffs allege violations of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.;* the Clean Water Act (CWA), 33 U.S.C. §§ 1251 *et seq.;* the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq.,* and its implementing regulations, 36 C.F.R. Part 219; and the Administrative Procedures Act (APA), 5 U.S.C. §§ 551 *et seq.*

The plaintiffs seek (1) a declaratory judgment and a mandatory injunction requiring the defendants to comply with NEPA by preparing an Environmental Impact Statement (EIS); (2) a permanent injunction barring the defendants from permitting logging of, or otherwise proceeding with, the Badger Timber Sale until a legally adequate EIS has been prepared; (3) a judgment declaring that proceeding with the Badger Timber Sale is not in accordance with applicable law and is, therefore, an arbitrary and capricious agency action in violation of the NEPA, the CWA, the NFMA, and the APA; and (4) a permanent injunction barring the defendants from permitting logging, or otherwise proceeding with, the Badger Timber Sale until the defendants have demonstrated adequate and complete compliance with all mandatory applicable provisions of the NEPA, the CWA, the NFMA, and the APA.

Jack K. Sterne, Camp Sherman, OR, for plaintiffs.

Kristine Olson, United States Attorney, Thomas C. Lee, Assistant United States Attorney, Portland, Oregon, Jeffrey K. Handy, Special Assistant United States Attorney, Office of General Counsel, USDA, Portland, Oregon, for federal defendants.

Scott W. Horngren, Julie A. Weis, Haglund & Kirtley LLP, Portland, Oregon, for defendant-intervenors.

## OPINION

FRYE, District Judge.

The matters before the court are 1) the plaintiffs' motion for summary judgment (# 45); 2) the defendant-intervenors' motion for summary judgment (# 52); and 3) the federal defendants' motion for summary judgment (# 57).

## BACKGROUND

On January 7, 1998, the plaintiffs, Blue Mountains Biodiversity Project and Oregon Natural Resources Council, filed this action against the defendants, F. Carl Pence, in his official capacity as Supervisor, Malheur National Forest, and the United States Forest Service (the Forest Service), challenging the Badger Timber Sale located in the Burns Ranger District of the Malheur National Forest.

On May 13, 1998, the court granted the motion of Malheur Lumber Company, Malh-

## FACTS

On May 25, 1990, the Regional Forester for the Pacific Northwest Region, Region 6 of the Malheur National Forest, signed the Record of Decision thereby adopting the Malheur Land and Resource Management Plan (LRMP) and the accompanying programmatic environmental impact statement (EIS). Record, p. 98. This Record of Decision contained a review of the draft EIS and the proposed LRMP. The selected alternative was intended to "promote[ ] the highest level of land stewardship in striving for healthy forest and range ecosystems, while producing both monetary and nonmonetary resource outputs." Record of Decision, p. 8.

The LRMP is a part of the framework for long-range planning thereby establishing a general direction for the next 10 to 15 years. The LRMP is implemented through the identification, selection and scheduling of projects to meet the management goals and objectives set by the LRMP. The Record of Decision indicates that the specific projects, including the timber sales to be offered, were displayed in an appendix to the LRMP.

In July of 1992, the Forest Service published a document entitled "Restoring Ecosystems in the Blue Mountains," Record, pp. 159–241, which contains an analysis of the "concerns for wildfire, water quality and quantity, fisheries, and epidemic scale insect infestation within the Blue Mountains." Record, p. 160. This report was a result of the work of the Blue Mountain Restoration Panel charged by the Regional Forester "with identifying areas where restoration work should occur on an accelerated schedule in order to establish long term resource objectives for recovery of the forest ecosystems." Record, p. 160.

On May 3, 1993, the Forest Service initiated an interdisciplinary team for the Badger Spring Subwatershed Planning Area (the Badger Planning Area) to act as technical specialists to develop an Integrated Resource Analysis and resulting NEPA decision documents to move the Badger Planning Area toward the "Desired Condition" set forth in the Malheur LRMP. Record, p. 252.

The Badger Planning Area is located on the west side of the Burns Ranger District of the Malheur National Forest in eastern Oregon. The Badger Planning Area encompasses 24,381 acres, which is comprised of two subwatersheds which the Forest Service refers to as "96F," encompassing 11,561 acres, and "96G," encompassing 12,820 acres. The major drainages in the area are Hay Creek, West Fork Hay Creek, West and North Fork Creeks, Deadwood Creek, and Alder Creek, all of which flow into Emigrant Creek.

On August 18, 1993, the Regional Forester directed that interim changes in timber sale planning and layout be implemented on forests in eastern Oregon and Washington (east side forests), including the Malheur National Forest. This direction (east side screens)

was the result of new information concerning species viability and the abundance and distribution of old growth stands of timber. This direction was designed to restrict timber harvest in certain areas so as to assure that the full array of planning options were preserved while the various items of information were being assessed and the need for new management direction evaluated through the preparation of the Eastside EIS. Record, p. 465.

This management direction required the use of three screens: 1) a riparian area direction, 2) an ecosystem screen, and 3) a wildlife screen during timber sale preparation to defer harvest of certain late and old structure timber stands unless certain conditions were met. Specifically, timber harvesting was deferred in riparian areas and limited in areas of late and old structure stands. As part of his August 18, 1993 direction, the Regional Forester established a "Regional oversight team" to review implementation of the screens, composed primarily of those specialists involved in the design of the screens. Record, p. 466. These screens were applied to the Badger Planning Area in an Integrated Resource Analysis issued in 1994 in order to identify areas suitable for commercial timber harvest and precommercial thinning. Record, p. 376.

On May 20, 1994, after preparation of an environmental assessment (EA), the Regional Forester issued a "Decision Notice for the Continuation of the Interim Management Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales." Record, pp. 453–496. This Decision Notice formally amended the LRMP's for the east side forests (Amendment # 1) incorporating the August 18, 1993 screens, as modified, into the Malheur LRMP. This amendment to the LRMP applied to the design of timber sales in certain riparian areas as well as late and old structural forest stands in the Badger Planning Area.

On June 5, 1995, after preparation of an EA, the Regional Forester issued a "Decision Notice for the Revised Continuation of Interim Management Direction Establishing Riparian, Ecosystem and Wildlife Standards

for Timber Sales," which amended Amendment # 1 to allow for certain harvest methods in late and old stands (Amendment # 2). Record, pp. 576–99. The Decision Notice of June 5, 1995 revised the vegetative structural stages used to determine the Historical Range of Variability in order to address concerns about fuel loads, mortality and decay in the forest and thereby reduce the risk of catastrophic wildfire and work toward an historical balance of structural stages. Record, p. 580.

In July of 1995, the Integrated Resource Analysis was updated and included in the "Watershed Analysis Badger Planning Area." Record, pp. 624–56. The Integrated Resource Analysis examined management practices to determine whether these practices were consistent with the LRMP. The findings in the Integrated Resource Analysis were that past management practices and exclusion of fire had resulted in the area containing higher than historical levels of fir species, which species is susceptible to insects and disease, and increasing levels of juniper. The Integrated Resource Analysis contained a discussion of methods to return the Badger Planning Area to its historical condition, an analysis of wildlife levels, needs and opportunities, and a discussion of the needs and opportunities of riparian areas and streams.

On July 28, 1995, the Forest Service amended the LRMP's in Forest Service Regions 1, 4 and 6 (INFISH) to provide standards for non-anadromous fish producing watersheds. Record, pp. 657–91. INFISH is a stated strategy for the conservation of riparian environments; it addresses the conservation of non-anadromous fish producing watersheds. INFISH superseded the riparian screen portion of Amendments # 1 and # 2.

In March of 1996, the Forest Service prepared the initial "Watershed/Fisheries Input Badger Analysis Area," a document which analyzed the effects of the proposed timber sales upon riparian areas in Alternative 1, subsequently adopted from the EA. Record, pp. 942–58. The final report, which is substantially the same, is contained in the administrative record at pp. 2107–123. The Analysis recognizes that INFISH adopted in July of 1995 gives direction to establish Riparian Habitat Conservation Areas (RHCA's) along all streams within the project area. The RHCA's are 300 feet wide on each side of fish-bearing streams, 150 feet wide on each side of perennial non-fish bearing streams or springs/wetlands (more than one acre), and 50 feet wide on each side of intermittent streams. The Watershed/Fisheries Input Badger Analysis Area document contains an analysis which notes that "all proposed harvest treatments within the Badger Analysis Area are located outside of RHCA's except for several aspen regeneration units." Record, p. 949. The Analysis further contains a consideration of the possible effects of aspen regeneration, pre-commercial thinning, and juniper eradication prescribed under burning and road reconstruction within the RHCA's. Record, pp. 949–52.

In July of 1997, the final EA for the Badger Planning Area was completed. Record, pp. 2045–104. In the EA, the Forest Service addressed the forest management needs of the Badger Planning Area identified in the Integrated Resource Analysis completed in 1994 and updated in 1995 in the Watershed Analysis. The Forest Service identifies the following highlights from the Integrated Resource Analysis:

1. Widespread forest health concerns include:

> Widespread mortality of trees is occurring due to insects and disease problems, drought, and overstocking.

> The increasing amount of Douglas-fir, white fir and Juniper and the decreasing amount of ponderosa pine in the stands[.]

2. As a result of past fire exclusion, slash accumulation from past activities, and mortality from insects and disease the probability of a large stand replacement fire occurring is high.

3. Access is not in compliance with the Forest Plan due to high road density. Some roads need to be closed and/or obliterated for wildlife and/or watershed reasons.

4. Forested areas are outside historical range of variability (HRV) for stand composition, structure, and densities.

Record, p. 2050.

On July 11, 1997, the Decision Notice and Forest Plan Amendment Number 48 for the Badger Planning Area was signed by the Forest Supervisor which implemented Alternative 1 from the EA for the Badger Planning Area. In the Decision Notice, the Forest Supervisor states:

Based on the site specific analysis described in the Badger Planning Area Environmental Assessment, it is my decision to implement Alternative 1, the Proposed Action Alternative, as the plan of management for the resources of these National Forest lands. This alternative initiates actions that enhance the health of the forest through a variety of commercial treatments that implement stocking control, salvage harvest dead and dying timber, rehabilitates aspen stands, and increases early seral species. This alternative also enhances the long term sustainability of the area by reducing fuel buildup. Features of Alternative 1 ... and applicable mitigation measures ... of this EA provide the best combination of physical, biological, social, and economic benefits.

Record, p. 2130.

In the Decision Notice of July 11, 1997, the Forest Supervisor finds that Alternative 1:

... is consistent with goals, objectives, and management area standards as stated in the Land and Resource Management Plan for the Malheur National Forest signed May 25, 1990 and the Regional Forester's Eastside Forest Plan Amendment No. 2. with three exception[s]:

1. Cover levels in both subwatersheds 96F and 96G would be reduced below minimum levels (standards) set in the Forest Plan.

2. This removes trees over 21″ DBH in areas that they are competing with aspen. Most of these areas are also within riparian areas.

3. This uses an individual selection harvest (a regeneration harvest) to maintain or enhance the old forest conditions.

Record, p. 2132.

In the Decision Notice of July 11, 1997, the Forest Service allows the harvest of approximately 10.7 million board feet of timber from approximately 3,560 acres. The harvest area includes 92 acres of conifers encroaching on aspen stands within the RHCA's. The remainder of the harvest is to occur outside of the RHCA's. The Decision Notice includes a "FINDING OF NO SIGNIFICANT IMPACT," which means that the Forest Service considers this harvest not to be a major federal action, and therefore it would not significantly affect the quality of the human environment, and as a consequence an environmental impact statement is not needed.

## CONTENTIONS OF THE PLAINTIFFS

The plaintiffs contend that the court should prohibit the Forest Service from proceeding with the proposed Badger Timber Sale pending the completion of a legally sufficient EIS.

The plaintiffs further contend that in the EA, the Forest Service fails to adequately analyze the potential negative impacts to the already degraded streams and the water quality in the Badger Planning Area. The plaintiffs contend that the EA contains no factual or scientific analysis or any analytic data that support the conclusion in the EA that there will be beneficial impacts to water quality and fish habitat as a result of logging and road construction within the RHCA's.

The plaintiffs further contend that substantial questions remain concerning the potential impact of the proposed Badger Timber Sale on the primary cavity excavators mandating the preparation of an EIS. The plaintiffs contend that the existing habitat conditions, as well as the populations and distribution of the primary cavity excavators, are either unknown or poor, requiring the preparation of an EIS.

## CONTENTIONS OF THE DEFENDANTS

Initially, the Forest Service notes that the plaintiffs have not presented any factual evi-

dence to support their allegations of the potential adverse effects of the Badger Timber Sale project.

The Forest Service contends that the EA and its administrative record adequately disclose the impacts of the Badger Timber Sale project on water quality standards and fisheries. The Forest Service points specifically to the input of the Fisheries Biologist/Hydrologist in the preparation of the EA for the Badger Timber Sale project and the Watershed/Fisheries Input for the Badger Analysis Area prepared in March of 1996.

The Forest Service contends that the EA prepared for the Badger Timber Sale project adequately addresses the impacts and potential impacts of the timber sales on primary cavity excavators. The Forest Service contends that it has complied with the NFMA with respect to primary cavity excavators.

The defendant-intervenors contend that the Forest Service has fully evaluated the effects of the proposed timber sale on stream habitat, and the Badger Timber Sale does not threaten the viability of management indicator species. The defendant-intervenors contend that the Badger Timber Sale is a model ecosystem restoration project that should be allowed to proceed for the benefit of the forest.

## APPLICABLE LAW

NEPA requires federal agencies to prepare an EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Forest Service must prepare an EIS for the Badger Timber Sale if "substantial questions are raised as to whether a project ... *may* cause significant degradation of some human environmental factor." *LaFlamme .v. F.E.R.C.,* 852 F.2d 389, 397 (9th Cir.1988) (internal quotations omitted) (emphasis in original). " 'The plaintiff need not show that significant effects *will in fact occur,* but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS *must* be prepared.' " *Greenpeace Action v. Franklin,* 982 F.2d 1342, 1351 (9th Cir.1992) (quoting

*LaFlamme,* 852 F.2d at 397) (emphasis in original).

In *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375–77, 109 S.Ct. 1851, 104 L.Ed.2d 377, the United States Supreme Court held that, where an agency has already conducted an environmental assessment, whether the agency need conduct an EIS is reviewed under an arbitrary and capricious standard. In *Northcoast Envtl. Ctr. v. Glickman,* 136 F.3d 660 (9th Cir.1998), the court . explained that "[u]nder the arbitrary and capricious standard, this court will only overturn an agency's decision if the agency committed a " 'clear error of judgment.' " " In making this inquiry, the question is whether the agency " 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.' " *Id.* at 666 (citations omitted).

NEPA "ensures that the agency ... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience...." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). NEPA requires that agencies " 'identify any methodologies used and [ ] make explicit reference by footnote to the scientific and other sources relied upon for conclusions'...." *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1150 (9th Cir.1998) (quoting 40 C.F.R. § 1502.24). The purpose of this requirement is to "provide the public with a basis for evaluating the impact of the proposed sale." *Id.*

## ANALYSIS

The issue before the court is whether the plaintiffs have raised substantial questions as to whether the Badger Timber Sale may have a significant effect on the quality of the human environment.

The plaintiffs have not presented evidence to support their claim that substantial questions remain concerning the potential impacts of the proposed Badger Timber Sale on water quality and fisheries and on primary cavity excavators. The plaintiffs claim that the Forest Service has failed to provide a con-

cerned public with the underlying data upon which it can determine whether the Forest Service should move forward with the timber sales, despite the potential impacts of the timber sales considered in the EA.

In *Idaho Sporting Congress*, the plaintiff claimed that an EIS was necessary because there were substantial questions as to whether the decision of the Forest Service to sell timber in the Miners Creek and West Camas Creek watersheds would have a significant effect on the water quality. Specifically, the plaintiff argued that the 1990 report consisting of the expert opinion of a Forest Service hydrologist based on the natural topography of the sale area failed to provide a factual and scientific site specific analysis and failed to provide the analytical data necessary for any challenge by the public to the proposed sale.

The United States Court of Appeals for the Ninth Circuit concluded that the 1990 report did "not satisfy NEPA's reporting and notice requirements because it fails to provide the public with a basis for evaluating the impact of the proposed sale." 137 F.3d at 1150. The court concluded that "NEPA requires that the public receive the underlying environmental data from which a Forest Service expert derived her opinion." *Id.*

In the case of the Badger Timber Sale, this court must examine the EA and the supporting administrative record relied upon by the defendants in order to determine whether the Forest Service carefully considered detailed information concerning the significant environmental impacts of the Badger Timber Sale on 1) water quality and fisheries, and 2) primary cavity excavators, and then determine whether the public was provided with a basis for evaluating the impact of the proposed timber sale.

1. · *Water Quality and Fisheries*

 Here, the plaintiffs complain that "[w]ithin the Badger EA, the entire discussion and analysis concerning the potential and environmental consequences on water resources is less than one page in length, and is comprised of eight mostly conclusory sentences." Plaintiff's Memorandum in Support of Motion for Summary Judgment, p. 14.

The defendants counter that "the Watershed/Fisheries Input and numerous other documents in the Administrative Record did provide the underlying data, and were written many months before the EA was submitted for public comment in January, 1997." Federal Defendants' Memorandum in Support of Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, p. 10.

The Badger Timber Sale was designed by the Forest Service to comply with the Inland Native Fish Strategy (INFISH), which amended the Malheur LMRP in July of 1995. INFISH established RHCA's which provide an established buffer to serve riparian management objectives which include a healthy, diverse plant community; stable solid and stream channels; diverse and complex habitat for native fish; and high quality water to support healthy communities of aquatic biota. There is no challenge by the plaintiffs to the adequacy of the established INFISH buffers in this action. The Badger Timber Sale complies with the Malheur National Forest Plan as amended specifically by INFISH, except for aspen regeneration harvesting within the RHCA's.

The Decision Notice of July 11, 1997 adopts Alternative 1 from the EA, which allows the harvest of 92 acres of conifers encroaching on aspen stands in the RHCA's along intermittent streams representing less than three percent of the 3,229 acres of proposed commercial harvest areas. The remainder of the commercial harvest proposed is outside of the RHCA's. The Notice of Decision states, in part:

The purpose of this amendment to the Malheur National Forest Plan is to:

. . . .

2. Allow harvesting of some trees over · 21″ DBH in areas where they are competing with aspen. These areas are also usually within the riparian areas.

Scattered throughout this area are numerous clones of aspen that are declining due to competition from the taller conifers. Some of these clones have declined to the point where they are in danger of being permanently being [sic]

lost. By removing these competing conifers and providing browse protection these aspen stands should be able to regenerate.

The modification of this standard (created by Regional Forester Amendment # 2) would allow these declining stands to reproduce and grow vigorously avoiding permanent loss and greatly improving diversity and high quality habitat for wildlife.

Record, p. 2133.

A review of the EA and the supporting administrative record shows an extensive discussion and analysis of water quality and fisheries. The aspen management aspects of the Badger Timber Sale project are fully discussed throughout the administrative record. The Watershed Fisheries Input for the Badger Analysis Area prepared in March of 1996 examines the effects of the proposed harvest within the RHCA's. The Forest Service subsequently designed the Badger Timber Sale project to be consistent with the results of this watershed analysis. The sale will reduce road densities through closure and obliteration; reduce sediment sources on existing roads by adding rock crossing and replacing culverts; improve aspen stand conditions in riparian areas; and limit commercial harvest in riparian areas to improve riparian conditions. The decision of the Forest Service to amend the Malheur National Forest Plan to allow for aspen regeneration in riparian areas without the preparation of an EIS is reasonable and supported by the EA and the administrative record.

■ The plaintiffs further contend that the EA is an insufficient disclosure document because it does not discuss violations of the Clean Water Act and state water quality standards. The plaintiffs contend that the EA is required to disclose that Hay Creek is a degraded watershed in order to adequately inform the public of the effects of the Badger Timber Sale project on water quality. In addition, the plaintiffs contend that the Badger Timber Sale project fails to take into consideration revised stream temperature standards thereby impairing redband trout population. The federal defendants and the intervenor-defendants contend that the EA need not address violations of the Clean Water Act and the water quality standards of the State of Oregon because no such violations occur.

The Clean Water Act requires each state to develop and implement water quality standards to protect and enhance the quality of water within the state. 33 U.S.C. § 1313; *Oregon Natural Resources Council v. United States Forest Serv.,* 834 F.2d 842, 848 (9th Cir.1987). The Clean Water Act requires each state to develop a state process to identify agricultural, silvicultural (forest management), and other nonpoint sources of pollution and to set forth procedures and methods to control such sources. These state procedures are called "best management practices." *Oregon Natural Resources Council v. Lyng,* 882 F.2d 1417, 1424 (9th Cir.1989), *as amended,* 899 F.2d 1565 (9th Cir.1990).

The Clean Water Act requires the Forest Service to comply with the water quality standards set by the State of Oregon. 33 U.S.C. § 1323. Proper implementation of state-approved "best management practices" will constitute compliance with the Clean Water Act unless water quality monitoring reveals that the "best management practices" have permitted violation of these water quality standards. *Id.*

The Forest Service has implemented the "best management practices" developed by the State of Oregon in the watershed analysis contained in the record. Record, pp. 1–94; 2120–122. These mitigation measures are specifically tailored to the Badger Timber Sale and conform specifically to the State of Oregon's regulatory scheme for protecting water quality.

The Forest Service acknowledged in the administrative record that Hay Creek was designated by the Oregon Department of Environmental Quality as a water quality limited stream because of high summer temperatures. Record, pp. 1313, 2109–110. The temperature management plan requirements are governed by a Memorandum of Understanding between the Forest Service and the Oregon Department of Environmental Quality. OAR 340–041–120(11)(e)(A).

Consistent with the Memorandum of Understanding, the Forest Service has collected water temperature monitoring data within the sale area. Record, pp. 879–91, 885, 1128, 2110. The Forest Service, thereafter, has applied "best management practices" in conformance with the regulatory scheme.

In addition, all of the harvest proposed in the Badger Timber Sale is located outside of the RHCA's, except for aspen regeneration units located along intermittent streams. Since Hay Creek is a water quality limited stream due to the high temperatures in the summer and the intermittent streams do not provide water to Hay Creek during the summer, conifers removed within intermittent streams in the RHCA's for aspen regeneration will not cause water quality standard violations in Hay Creek.

The court concludes that the Forest Service took a hard look at the issues of water quality and fisheries in the EA and the supporting administrative record and proposed a timber sale which required an amendment to the Malheur LRMP in order to accomplish the desired aspen regeneration. The Forest Service carefully considered any significant environmental impacts and reasonably concluded that there were none. Record, p. 2134. The record in this case provides the public with a basis for evaluating the impact of the proposed Badger Timber Sale on water quality and fisheries.

### 2. *Primary Cavity Excavators*

█ The plaintiffs contend that the Forest Service proposes to commercially log another 10.7 million board feet of timber in the Badger Timber Sale without sufficient baseline data for existing wildlife habitat and without knowledge of the existing distribution or population trends of management indicator species.

The defendants contend that the primary cavity excavator habitat was monitored by the Forest Service at both the Forest and District levels, and that the results are contained in the administrative record. The federal defendants assert that the Badger Project does not reduce dead and defective tree habitat utilized by primary cavity excavator species as noted in the Decision Notice of

July 11, 1997 implementing Alternative 1 from the EA.

In *Inland Empire Public Lands Council v. United States Forest Serv.*, 88 F.3d 754 (9th Cir.1996), the United States Court of Appeals for the Ninth Circuit stated:

> The NFMA envisions a two-stage approach to forest planning. At the first stage, 'a team ... develops a proposed [Land Resource Management Plan ("LRMP") ] together with a draft and final EIS.' Once the LRMP is approved, '[d]irect implementation of the LRMP occurs at a second stage, when individual site-specific projects are proposed and assessed.' These site-specific projects must be consistent with the stage-one, forest-wide plan.

*Id.* at 757 (citations omitted) (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1511 (1992)).

The NFMA directs the Secretary of Agriculture to issue regulations "under the principles of the Multiple–Use Sustained–Yield Act [ (MUSYA) ] of 1960 [16 U.S.C.A. §§ 528–531], that set out the process for the development and revision of the [LRMP's]." 16 U.S.C. § 1604(g). Among other things, the regulations are to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B). The viability regulation provides that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19.

After the Forest Service designates a management indicator species, it must evaluate the effects of the proposed activities "in terms of both amount and quality of habitat and of animal population trends of the management indicator species." 36 C.F.R. § 219.19(a)(2). In order to satisfy these obligations, the Forest Service may use habitat as a proxy for management indicator species populations. *Inland Empire*, 88 F.3d at 761.

█ Since the NFMA regulations are directed to the preparation of LRMP's at the

first stage of the planning process, the viability regulation, 36 C.F.R. § 219.19 of NFMA, applies to the LRMP level and not to the project level. *See Sharps v. United States Forest Serv.,* 28 F.3d 851, 855 (8th Cir.1994); and *Environment Now! v. Espy,* 877 F.Supp. 1397, 1420 (E.D.Cal.1994).

In the case of the Badger Timber Sale, the Forest Service designed the timber sale project to comply with the Malheur LRMP, as amended by Amendments #1 and #2 and INFISH, in order to comply with the viability regulation. Eight woodpecker species, which are management indicator species, have habitat within the Badger Planning Area. Record, pp. 986–89. The Forest Service evaluated the effects of the Badger Timber Sale on these woodpecker species, also referred to as primary cavity excavator species, by analyzing the potential effects of the timber sale on dead and defective trees, also known as "snag" habitat. Record, pp. 984–86, 1010, 2059, 2088. The Forest Service then predicted the effects of the timber sale on this management indicator species population, using scientific data describing the relationship between the snag habitat and the biological requirements of the species. Record, pp. 986–89, 1011, 2088.

The EA concludes:

There would be a minor change to primary cavity excavator populations as snags are reduced from current levels to a managed level of 100% of potential population levels. Retention of green replacement trees of various size classes at established forest plan levels would insure that there would be sufficient snags in the future to maintain viable populations of primary cavity excavators over time.

Record, p. 2088. This conclusion is supported in the administrative record and consistent with the Malheur LRMP. Record, pp. 494, 983.

The plaintiffs further criticize the Forest Service for its evaluation of the effects of cover reduction on the management indicator species.

The Decision Notice of July 11, 1997 states, in part:

The purpose of this amendment to the Malheur National Forest Plan is to:

1. Allow cover·levels to drop below the established standards for big game summer and winter range for subwatershed 96f and 96g.

 This modification would allow silvicultural treatments of cover stands that are overstocked and have widespread mortality due to epidemic insect levels of Douglas-fir tussock moth and fir engraver beetle. Without such treatments, cover loss through mortality is likely over the next five years. Risk of loss of these areas and as sources of fire starts is high. Vegetative treatments would reduce insect levels, change stand compositions to more historic compositions, and reduce fire risk. Vegetative and fuel treatments in these stands would provide management options in the future for re-development of big game cover areas.

Record, p. 2133. The EA fully disclosed the proposed reduction in cover and explained the need for the amendment to the LRMP. The conclusion that this amendment did not require the preparation of an EIS is reasonable and supported by the administrative record.

### CONCLUSION

The plaintiffs' motion for summary judgment (#45) is denied; the defendant-intervenors' motion for summary judgment (#52) is granted; and the federal defendants' motion for summary judgment (#57) is granted.