92 F.3d 1503
 65 USLW 2126, 96 Cal. Daily Op. Serv. 6152,
96 Daily Journal D.A.R. 10,100
 In re IMPERIAL CORPORATION OF AMERICA, Related Litigation.
FEDERAL DEPOSIT INSURANCE CORPORATION,* in
its corporate capacity and as receiver for
Imperial Federal Savings Association,
Plaintiff-Appellant,
v.
Robert S. ALSHULER, Defendant,
and
Barclay Davidson, Michael Lea, and Anthony E. Maniscalco,
II, Defendants-Appellees.
FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate
capacity and as receiver for Imperial Federal
Savings Association, Plaintiff-Appellant,
v.
Mark L. KLINE, Defendant-Appellee.
FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate
capacity and as receiver for Imperial Federal
Savings Association, Plaintiff-Appellant,
v.
Robert S. ALSHULER, et al., Defendants,
and
Gary M. Cypres, Defendant-Appellee.
 Nos. 95-55233, 95-55236, 95-56045.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 11, 1996.
Decided Aug. 19, 1996.
 
 Roberta H. Clark, Federal Deposit Insurance Corporation, Washington, D.C., for the plaintiff-appellant.
 Seth Aronson, O'Melveny & Myers, Los Angeles, California, for defendant-appellee Gary M. Cypres.
 Peter K. Rosen and Mark P. Lynch, Weisman & Rosen, Los Angeles, California, for defendants-appellees Mark L. Kline and Michael Lea.
 Paul M. Mahoney, Jones, Mahoney & Brayton, Claremont, California, for defendant-appellee Anthony E. Maniscalco, II.
 Jeffrey L. Jackson, San Diego, California, for defendant-appellee Barclay Davidson.
 Appeals from the United States District Court for the Southern District of California, Irma E. Gonzalez, District Judge, Presiding. D.C. Nos. CV-93-0992-IEG, CV-93-0509-IEG and CV-93-0992-IEG.
 Before: O'SCANNLAIN and TROTT, Circuit Judges; VAN SICKLE,** District Judge.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 In this first of two related cases[1] arising out of the failure of the Imperial Savings Association, we must decide whether a court-approved settlement of a shareholder derivative suit precludes the receiver from bringing mismanagement claims against former officers and directors.
 
 
 2
 * The Federal Deposit Insurance Corporation ("FDIC"), as receiver for failed savings and loan Imperial Savings Association ("ISA"), appeals the district court's summary judgment for ISA's former officers and directors in the FDIC's actions for negligence and breach of fiduciary duty (the "mismanagement claims"). The district court concluded that claim preclusion barred the FDIC from obtaining judgment against the officers and directors because of a court-approved, class action shareholder derivative suit, Shields v. Thygerson,[2] which settled shortly before federal regulators seized ISA.
 
 
 3
 ISA, a San Diego-based savings and loan, was a wholly-owned subsidiary of Imperial Corporation of America ("ICA"), a financial institution holding company. ICA and ISA shared the same board of directors. The Shields settlement resolved consolidated shareholder derivative and federal securities class actions involving ICA's investments in junk bonds and consumer loans. These investments arose from transactions with Michael Milken and Drexel Burnham Lambert in the late 1980s.
 
 
 4
 Appellees Barclay Davidson, Mark L. Kline, Michael Lea, and Anthony E. Maniscalco II (collectively "the officers") were ISA officers between 1987 and 1989 and were allegedly involved in imprudent investments and transactions. Appellee Gary M. Cypres served on the ICA and ISA boards as an outside director from March 1987 to December 1988.[3]
 
 
 5
 Davidson claims that he was only an officer (vice president) of ISA between May and July of 1988, and that he was "a mere employee" (marketing representative) when the allegedly imprudent loans were arranged prior to January 1988. According to the FDIC's complaint, Kline was "Executive Officer in charge of First Financial Equities Corporation," an ISA subsidiary "involved in acquisition of real estate, and was a member of the Executive Lending and Investment Committee, which was responsible for credit risk underwriting of all lending investments" at ISA. In the Shields complaint, Lea was named as a "Senior Vice-President Financial and Economic Analysis" of ICA. Maniscalco took part in a $16 million loan made in 1988 by ISA to Global Motors, the importer of the Yugo automobile--the loan went into default. Although Maniscalco was not named in the Shields complaint, the complaint referred to the defaulted Global Motors loan, which is also cited in the FDIC's allegations against Maniscalco.
 
 
 6
 The Shields class action and derivative complaint alleged violations of federal securities laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and relevant state laws. The complaint specifically alleged that between 1987 and 1989, officers and directors of ICA and ISA engaged in imprudent financial policies, including inadvisable loans.
 
 
 7
 The parties prepared a Stipulation of Settlement, which provided that American Casualty Company would make a $12.5 million payment to an escrow fund, of which $10 million would be "deemed" to be in settlement of the class actions and $2.5 million would be "deemed" to be in settlement of the derivative actions. ICA was obligated to contribute an additional $500,000 to the escrow fund, creating a total settlement fund of $13 million for payment to the plaintiffs in the class actions. The settlement released the directors and officers of ICA and ISA from any claims that might have been brought against them by ICA or ISA.
 
 
 8
 On December 15, 1989, the ICA Board approved the Stipulation of Settlement.[4] The settlement included ICA, ISA, and all ICA subsidiaries and affiliates in the definition of "Signatory Defendants." At a hearing on February 22, 1990, U.S. Magistrate Judge Harry McCue approved the settlement under Federal Rules of Civil Procedure 23 and 23.1 and signed the final judgment.[5] Magistrate Judge McCue concluded that (1) the notice provided to shareholders was "the best notice practicable under the circumstances"; (2) the settlement was "the product of good faith arm's length negotiations"; and (3) the settlement was "fair, reasonable and adequate as to" ICA and the shareholders.
 
 
 9
 On the same day that Magistrate Judge McCue approved the settlement, the United States Office of Thrift Supervision ("OTS") ordered the seizure of ISA and placed it into conservatorship under the RTC. OTS Order No. 90-375 (Feb. 22, 1990). On February 28, 1990, ICA filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.
 
 
 10
 In its corporate capacity and as receiver for ISA, the Resolution Trust Corporation ("RTC") filed actions against the officers, as well as the directors and other executives of ISA, to recover damages for the losses suffered by ISA as a result of the imprudent transactions that took place between 1987 and 1989. On June 22, 1994, the district court granted the officers' and directors' motion for summary judgment on the two mismanagement claims (negligence and breach of fiduciary duty), concluding that the claims were barred by claim preclusion. Pursuant to Federal Rule of Civil Procedure 54(b), the district court entered judgments on the mismanagement claims in favor of Appellees Cypres, Davidson, Kline, Lea, and Maniscalco. The RTC timely filed notices of appeal.
 
 II
 
 11
 The doctrine of claim preclusion (res judicata) provides that a final judgment on the merits bars a subsequent action between the same parties or their privies over the same cause of action. Davis & Cox v. Summa Corp., 751 F.2d 1507, 1518 (9th Cir.1985) (citations omitted). "The judgment prevents litigation of all grounds and defenses that were or could have been raised in the action." Id. (citing Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414-15, 66 L.Ed.2d 308 (1980)). The parties must have had "a full and fair opportunity to litigate." Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).
 
 
 12
 This court has held that "when two parties are so closely aligned in interest that one is the virtual representative of the other, a claim by or against one will serve to bar the same claim by or against the other." Nordhorn v. Ladish Co., Inc., 9 F.3d 1402, 1405 (9th Cir.1993) (citations omitted). Furthermore, "[c]orporate affiliations may be relevant in determining whether two parties are in privity for purposes of issue or claim preclusion." Id. (citing In re Gottheiner, 703 F.2d 1136, 1139-40 (9th Cir.1983) (defendant in prior suit was wholly owned by defendant in subsequent suit, and collateral estoppel barred second suit)).
 
 
 13
 In determining whether successive lawsuits involve the same cause of action, this court considers the following factors:
 
 
 14
 (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts.
 
 
 15
 Nordhorn, 9 F.3d at 1405 (quoting Costantini v. Trans World Airlines, 681 F.2d 1199, 1201-02 (9th Cir.) (citation omitted), cert. denied, 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982)); see Costantini, 681 F.2d at 1202 (citation omitted) ("The last of these criteria is the most important.").
 
 
 16
 * Here, the district court held that claim preclusion barred the FDIC's mismanagement claims against the officers and director Cypres. The court concluded that although ISA was neither a named defendant in the Shields litigation nor a signatory in the Shields settlement agreement, ISA was nonetheless a party to the Shields action for the purposes of claim preclusion.
 
 
 17
 Emphasizing that ISA was a wholly-owned subsidiary of ICA, which was a named defendant and signatory in Shields, and that the boards of ICA and ISA were identical, the court reasoned that ICA was the "virtual representative" of ISA in the Shields action. See Nordhorn, 9 F.3d at 1405. The court bolstered this conclusion by observing that (1) as a financial holding corporation, ICA conducted its savings and loan business only through ISA (hence, "but for the existence of ISA, there would have been little or no ground for" the claims brought in Shields ); and (2) the Shields settlement was approved in principle at a joint meeting of the boards of ICA and ISA on November 30, 1989.
 
 
 18
 Next, considering the factors outlined in Nordhorn, 9 F.3d at 1405, the district court concluded that the FDIC's mismanagement claims "were the same 'claim' for res judicata purposes such that the RTC [FDIC] is now precluded from asserting them here against these defendants." The court determined that the FDIC's mismanagement claims (invoking breach of fiduciary duty and negligence) were virtually the same allegations made in the Shields complaint. Both sets of allegations concerned imprudent investments, loan transactions, and leases between 1987 and 1989 by officers of ICA and ISA.
 
 B
 
 19
 On appeal, the FDIC argues that the district court erred because (1) a genuine issue of material fact exists as to whether ICA was the virtual representative of ISA in the Shields settlement; and (2) the FDIC's mismanagement claims are different from the claims advanced by the shareholder plaintiffs in Shields. We are not persuaded.
 
 
 20
 * The FDIC argues that "[t]he fact that one entity is a wholly owned subsidiary of another entity is insufficient to establish privity between the two entities for purposes of the defense of claim preclusion." The FDIC raises four major contentions in support of this argument.
 
 
 21
 First, the FDIC's contention that "[t]he parent/subsidiary relationship of ICA and ISA, though potentially relevant, is not dispositive" is unpersuasive in light of this court's clear holdings to the contrary. See, e.g., Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Dev. Corp., 933 F.2d 724, 728 (9th Cir.1991) (holding that "wholly-owned subsidiary and partnership in which that subsidiary is the general partner may invoke the two dismissals of the subsidiary's parent and claim Rule 41(a)(1) res judicata"), cert. denied, 503 U.S. 920, 112 S.Ct. 1295, 117 L.Ed.2d 518 (1992); Gottheiner, 703 F.2d at 1139-40 (defendant in prior suit was wholly owned by defendant in subsequent suit, and collateral estoppel barred second suit); Sparks Nugget, Inc. v. CIR, 458 F.2d 631, 639 (9th Cir.1972) (privity exists between a sole or controlling stockholder and its company), cert. denied sub nom. Graves v. CIR, 410 U.S. 928, 93 S.Ct. 1362, 35 L.Ed.2d 589 (1973); see also Pollard v. Cockrell, 578 F.2d 1002, 1008-09 (5th Cir.1978) (citation omitted) (the virtual representation doctrine contemplates relationships such as that between parent corporation and its subsidiary); Greenberg v. Potomac Health Sys., Inc., 869 F.Supp. 328, 330-31 (E.D.Pa.1994) (litigation against parent barred subsequent claim against wholly-owned subsidiary).
 
 
 22
 Second, the FDIC's reliance on Johnson & Johnson v. Coopervision, Inc., 720 F.Supp. 1116, 1123 (D.Del.1989), is unwarranted. In Johnson & Johnson, the district court stated in dicta that "[t]he fact that Iolab is Johnson & Johnson's wholly-owned subsidiary is insufficient to establish privity between the two entities" for the purposes of determining whether a litigant would be prejudiced by the failure to join Iolab as a necessary party to a suit against Johnson & Johnson. Id. at 1122-23; see id. at 1124 ("[i]t would be premature for this Court to endeavor to decide whether Iolab and Johnson & Johnson are in privity in bringing the instant action"). This dicta from a district court beyond this circuit is not persuasive authority for the FDIC's contention, especially considering that this court has held that "[c]orporate affiliations may be relevant in determining whether two parties are in privity for purposes of issue or claim preclusion." Nordhorn, 9 F.3d at 1405.
 
 
 23
 Third, the FDIC contends that ICA could not adequately represent the ISA's interests because ISA "was a federally insured savings and loan with separate and distinct duties to its depositors, insurers, regulators and creditors." Citing General Rubber Co. v. Benedict, 215 N.Y. 18, 109 N.E. 96 (1915),[6] the FDIC maintains that ISA "has separate derivative claims that it may pursue against its own officers and directors even though some of the same misconduct may also give rise to derivative claims on behalf of the parent company." This contention is without merit because ICA's role in the settlement would be meaningless without regard to the interests of ISA, through which ICA conducted the financial activities that were the subject of the Shields allegations. ICA was simply a holding company; the close alignment in interests between ICA and ISA is evidenced by the identical memberships of their boards.
 
 
 24
 Fourth, although the FDIC concedes that the Shields settlement was conditionally approved at a joint meeting of the ICA and ISA boards on November 30, 1989, the FDIC argues that only the ICA board gave the final approval to the settlement on December 15, 1989. This argument lacks significance, considering that (1) the ICA and ISA boards were identical in membership; (2) the parent ICA had the authority to bind its wholly-owned subsidiary ISA; and (3) the FDIC concedes that the ISA board, qua ISA board, reviewed the settlement and gave its approval (albeit conditional).
 
 
 25
 Moreover, the final judgment in Shields includes the following in its list of "Signatory Defendants": "Imperial Corporation of America, Imperial Savings of America[7] and all subsidiaries and affiliates of Imperial Corporation of America and Imperial Savings of America." Further, the Shieldsjudgment states: "Imperial Corporation of America and Imperial Savings of America and related entities are collectively referred to as 'Imperial'."
 
 
 26
 Even viewing the evidence in the light most favorable to the FDIC, the FDIC has failed to raise a genuine issue of material fact as to whether ICA was ISA's virtual representative in the Shields litigation.
 
 2
 
 27
 Next, the FDIC has failed to establish that its mismanagement claims are different from the negligence and fiduciary duties claims in the Shields action.
 
 
 28
 Although the FDIC concedes that "many of the same wholesale consumer loan transactions identified in the Shields litigation are present here," the FDIC nonetheless maintains that its mismanagement claims involve infringement of different rights, require different evidence, and do not arise out of the same transactional nucleus of facts.
 
 
 29
 In fact, the FDIC stresses the federal securities claims brought in Shields, while glossing over the pendent state law claims for relief, which alleged negligence and breaches of fiduciary duties in the context of imprudent loans, leases, and other transactions. These claims closely resemble the FDIC's mismanagement claims. As an example of the shared transactional nucleus between the two suits, the complaints in both actions refer to the Global Motors loans.[8]
 
 
 30
 As the district court concluded, the FDIC's mismanagement claims "arise out of the defendants' alleged mismanagement of ISA during the period between 1987 and 1989 by, among other things, causing ISA to invest in bad consumer and auto loans and leases, and failing to establish adequate loan reserves. These are virtually the same allegations made in ... the Shields litigation."
 
 III
 
 31
 We also consider the FDIC's assertion that claim preclusion is inapplicable because its predecessor-in-interest, ISA, did not have a "full and fair opportunity to litigate" in the Shields action. The FDIC rests this argument on its contentions that ISA's interests were not adequately represented in Shields and that the Shields settlement was marred by conflicts of interest, material nondisclosures, and the imminent seizure of ISA by federal regulators. Although it is an open question whether the FDIC's accusations could form the basis of a potential claim for legal malpractice or fraudulent transfer,[9] the accusations alone do not compel a finding that Shields failed to provide a "full and fair opportunity" for litigation.
 
 
 32
 After all, any one of ICA's shareholders could have brought such objections during the settlement approval process, but no one did. Instead of seeking direct review or filing a Rule 60(b) motion alleging fraud or misconduct within one year after the Shields judgment, the RTC (and, now, the FDIC) waited three years to raise these allegations of fraud, collusion, and deceit on the part of the Shields participants. See Fed.R.Civ.P. 60(b). Moreover, the FDIC has not demonstrated that Magistrate Judge McCue failed to enforce the procedural safeguards outlined in Federal Rule of Civil Procedure 23.1, which governs court approval of shareholder derivative actions.
 
 
 33
 In addition, we reject the FDIC's contention that FDIC v. O'Melveny & Myers, 61 F.3d 17, 19 (9th Cir.1995) (on remand from Supreme Court), stands for the broad proposition that equitable defenses may not be used against the FDIC as a receiver. In FDIC v. O'Melveny & Meyers, this court held "only that the bank's inequitable conduct is not imputed to FDIC" for the purpose of precluding the FDIC as receiver from bringing a legal malpractice action against the failed savings and loan association's former counsel. 969 F.2d 744, 752 (9th Cir.1992), rev'd, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). This court expressly cautioned that "it does not necessarily follow that equitable defenses can never be asserted against FDIC acting as a receiver." Id. at 752. The Supreme Court reversed, holding that state law, not federal law, governs whether corporate officers' knowledge of fraud can be imputed to the FDIC suing as a receiver. O'Melveny & Myers v. FDIC, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67.
 
 
 34
 The Court emphasized that "the FDIC is not the United States," id. at ----, 114 S.Ct. at 2053, and that "[12 U.S.C.] § 1821(d)(2)(A)(i) places the FDIC in the shoes of the insolvent S & L, to work out its claims under state law...." Id. at ----, 114 S.Ct. at 2054; see also id. at ----, 114 S.Ct. at 2055 ("there is no federal policy that the fund should always win"). The Court remanded to this court to resolve how California law applies to the issue of whether the savings and loan officers' knowledge of fraudulent conduct could be imputed to the FDIC as receiver. On remand, this court reached "the same conclusion as ... last time." O'Melveny & Myers, 61 F.3d at 19 (republishing relevant language from O'Melveny & Meyers, 969 F.2d at 751-52, and noting, under California law, that defenses based on party's unclean hands or inequitable conduct do not generally apply against party's receiver). Accordingly, O'Melveny & Myers in no way compels the conclusion that claim preclusion is an invalid defense in an action initiated by the FDIC as a receiver.IV
 
 
 35
 Finally, the FDIC contends that the only way that ICA could have asserted ISA's claims would have been by means of a double derivative action.[10] Since the FDIC maintains that the Shields litigants did not observe the proper procedures for bringing a double derivative action, the FDIC argues that ISA's derivative claims were not advanced.
 
 
 36
 This argument is a red herring because claim preclusion clearly bars not only claims that were actually litigated, but also any claims that could have been asserted. See Costantini v. Trans World Airlines, 681 F.2d 1199, 1201 (9th Cir.), cert. denied, 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982). Considering the FDIC's concession that the Shields plaintiffs could have brought a proper double derivative suit, it naturally follows that such claims are barred by claim preclusion. Furthermore, the Shields judgment plainly released any and all claims that could be brought against "present and former" officers. See Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1287-88 (9th Cir.) (upholding release of claims that were not alleged), cert. denied sub nom. Hoffer v. City of Seattle, 506 U.S. 953, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992); see also Matsushita Elec. Indus. Co., Ltd. v. Epstein, --- U.S. ----, ---- - ----, 116 S.Ct. 873, 880-81, 134 L.Ed.2d 6 (1996) (holding that state court judgment settling shareholders' state and federal claims had preclusive effect in federal court even though shareholders could not have pressed their federal claims in state court).
 
 V
 
 37
 For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the ISA officers and director Cypres.
 
 
 38
 AFFIRMED.
 
 
 
 *
 On June 22, 1990, the Resolution Trust Corporation ("RTC") became receiver of Imperial Savings Association ("ISA"), and the United States Office of Thrift Supervision transferred ISA's assets and liabilities to a new entity, Imperial Federal Savings Association ("IFSA"), of which the RTC became conservator. On December 31, 1995, pursuant to 12 U.S.C. § 1441a(m)(1), the Federal Deposit Insurance Corporation ("FDIC") assumed responsibility for the functions of the RTC and acquired its assets and liabilities. Accordingly, the FDIC is the statutory successor to the RTC in its corporate capacity and as receiver for ISA
 
 
 **
 The Honorable Bruce M. Van Sickle, Senior United States District Judge for the District of North Dakota, sitting by designation
 
 
 [1]
 Today, we also decide the related case of Durkin v. Shea & Gould, 92 F.3d 1510 (9th Cir.1996)
 
 
 [2]
 Shields v. Thygerson, Civ. No. 89-0126-JLI(M) (S.D.Cal. Feb. 22, 1990)
 
 
 [3]
 FDIC v. Cypres (No. 95-56045) raises precisely the same issues presented in the Davidson and Kline appeals
 
 
 [4]
 All members of ICA's board were named defendants in the Shields suit
 
 
 [5]
 Under Federal Rule of Civil Procedure 23(e), the district court determines whether a proposed settlement is "fundamentally fair, adequate, and reasonable." In re Pacific Enters. Sec. Litig., 47 F.3d 373, 377 (9th Cir.1995) (internal quotation marks and citations omitted). Rule 23.1 provides that a shareholder derivative action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association." Rule 23.1 also requires that "[t]he action shall not be dismissed or compromised without the approval of the court." Fed.R.Civ.P. 23.1. "Before approving a class action settlement, the district court must reach a reasoned judgment that the proposed agreement is not the product of fraud or overreaching by, or collusion among, the negotiating parties." Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1290 (9th Cir.) (internal quotation marks and citations omitted), cert. denied sub nom. Hoffer v. City of Seattle, 506 U.S. 953, 113 S.Ct. 408, 121 L.Ed.2d 333 (1992)
 
 
 [6]
 Actually, General Rubber fails to support the FDIC's position, to the extent that the FDIC is bringing claims quite similar to those brought in Shields. "General Rubber ... permits a parent company to sue the wrongdoer for breach of fiduciary duty, despite the fact that the subsidiary company may maintain an action against the same defendant for conversion. This rule does not, however, permit a parent and subsidiary company to assert the same cause of action against the same defendant." Sound Video Unlimited, Inc. v. Video Shack Inc., 700 F.Supp. 127, 137 (S.D.N.Y.1988) (emphasis added)
 
 
 [7]
 Apparently, this is a typographical error. In any case, "all subsidiaries and affiliates of Imperial Corporation of America" clearly includes ISA
 
 
 [8]
 See International Union of Operating Eng'rs-Employers Constr. Indus. Pension, Welfare & Training Trust Funds v. Karr, 994 F.2d 1426, 1430 (9th Cir.1993) (citations omitted) (noting that this court has "previously applied the doctrine of res judicata on the ground that the two claims arose out of the same transaction, without reaching other factors cited in Costantini ")
 
 
 [9]
 Indeed, the FDIC has brought fraudulent transfer claims against ICA directors, but these claims are not before us in this appeal. In addition, in a related appeal which we also decide today, the representative of ICA's bankruptcy estate has brought malpractice claims against ICA's attorneys for their role in Shields. See Durkin v. Shea & Gould, 92 F.3d 1510 (9th Cir.1996)
 
 
 [10]
 "A 'double derivative' suit has been defined as an action brought by a shareholder of a holding or parent company, on behalf of that corporation, to enforce a cause of action in favor of the subsidiary company. The shareholder is, in effect, maintaining a derivative action on behalf of the subsidiary, since the holding or parent company has derivative rights to the cause of action possessed by the subsidiary. The directors of both the parent and the subsidiary must refuse to enforce the cause of action." Gaillard v. Natomas Co., 173 Cal.App.3d 410, 219 Cal.Rptr. 74, 79 n. 7 (1985) (citations omitted)