NATIONAL WILDLIFE FEDERA-TION, Sierra Club, Idaho Rivers United, American Rivers, Pacific Coast Federation of Fisherman's Associations, Institute for Fisheries Resources, Washington Wildlife Federation, and Idaho Wildlife Federation, Plaintiffs,

Nez Perce Tribe Of Idaho, Intervenor–Plaintiff,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, Defendant,

Potlatch Corporation, Northwest Pulp and Paper Association, Inland Ports and Navigation Group, and Columbia River Alliance, Intervenor–Defendants.

Civil No. 99–442–FR.

United States District Court, D. Oregon.

March 21, 2000.

Craig N. Johnston, Stephanie M. Parent, Portland, OR, Todd D. True, Kristen L. Boyles, Seattle, WA, for Plaintiffs.

David J. Cummings, Nez Perce Tribal Executive Committee Office of Legal Counsel, Lapwai, ID, for Intervenor–Plaintiff Nez Perce Tribe of Idaho.

Kristine Olson, United States Attorney, Thomas C. Lee, Assistant United States Attorney, Portland, OR, Fred R. Disheroon, Special Litigation Counsel, U.S. Department of Justice Environment & Natural Resources Division, Washington, DC, for Federal Defendant.

Richard S. Gleason, Stoel Rives LLP, Portland, OR, Beth S. Ginsberg Stoel Rives LLP, Seattle, WA, Kevin J. Beaton, Stoel Rives LLP, Boise, ID, for Intervenor–Defendants Potlatch Corporation and Northwest Pulp and Paper Association.

Paul M. Murphy, James L. Buchal, Murphy & Buchal LLP, Portland, OR, for Intervenor–Defendant Columbia River Alliance.

Guy C. Stephenson, Schwabe Williamson & Wyatt, P.C., Portland, OR, Walter H. Evans, III, Schwabe Williamson & Wyatt, P.C., Vancouver, WA, for Intervenor–Defendant Inland Ports and Navigation Group.

## OPINION

FRYE, District Judge.

The matters before the court are:

1. Plaintiffs' motion for summary judgment (# 36);

2. Defendant United States Army Corps' cross-motion for summary judgment (# 64);

3. Intervenor–Defendants Potlatch and NWPPA's motion for summary judgment (# 75);

4. Intervenor–Defendant Inland Ports and Navigation Group's motion for summary judgment (# 83);

5. Intervenor–Defendant Columbia River Alliance's motion to make more definite and certain; motion to strike; joinder in motion for summary judgment; and alternative motion for a continuance (# 81).

## BACKGROUND

On March 31, 1999, the plaintiffs, National Wildlife Federation, Sierra Club, Idaho Rivers United, American Rivers, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, Washington Wildlife Federation,

and Idaho Wildlife Federation, filed this complaint against the defendant, United States Army Corps of Engineers (hereinafter referred to as "the Corps"). The plaintiffs allege that the actions of the Corps in operating four dams—Ice Harbor, Lower Monumental, Little Goose, and Lower Granite—all located on the Lower Snake River, violate the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, and its implementing regulations, and the Administrative Procedures Act, 5 U.S.C. §§ 551 *et seq.*

The plaintiffs allege that the Corps owns and operates these four dams in a manner that causes violations of the water quality standards of the State of Washington for temperature and dissolved gas, as well as the antidegradation standard. The plaintiffs allege that "[t]hese water quality standard violations constitute serious, long-standing, and ongoing violations of federal law that have degraded water quality, impaired beneficial uses, and pushed imperiled salmon and steelhead species to the brink of extinction." Complaint for Declaratory and Injunctive Relief, p. 2, ¶ 4.

The plaintiffs seek 1) a judicial declaration that the actions of the Corps violate the federal Clean Water Act and the Administrative Procedures Act; 2) an injunction directing the Corps to comply with the water quality standards of the State of Washington; and 3) ask the court to set a schedule for the parties to comply with the order of the court. *Id.* at p. 20.

On August 26, 1999, the court allowed the motions to intervene as defendants by Potlatch and NWPPA, Inland Ports and Navigation Group, and Columbia River Alliance.

On September 1, 1999, the court allowed the motion to intervene as plaintiff by the Nez Perce Tribe of Idaho.

On October 27, 1999, intervenor-plaintiff Nez Perce Tribe of Idaho joined in the motion for summary judgment filed by the plaintiffs.

## FACTS AND LAW

The Corps owns and operates the four lower Snake River hydro power projects as part of the Federal Columbia River Power System. From the confluence of the Columbia and Snake Rivers looking upstream, the four lower Snake River dams are Ice Harbor, completed in 1961; Lower Monumental, completed in 1969; Little Goose, completed in 1970; and Lower Granite, completed in 1975.

### The Clean Water Act

In 1972, Congress passed the Clean Water Act in order "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through the reduction and eventual elimination of the discharge of pollutants into those waters. 33 U.S.C. § 1251(a). The Clean Water Act provides for two primary sets of water quality measures: 1) effluent limitations; and 2) water quality standards. *See Arkansas v. Oklahoma,* 503 U.S. 91, 101, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992).

"Effluent limitations" are promulgated by the Environmental Protection Agency (EPA) and restrict the quantities, rates, and concentrations of specified substances which are discharged from point sources. Sections 1311, 1314. These effluent limitations are translated into enforceable obligations in National Pollutant Discharge Elimination System (NPDES) permits issued to "point source" or end-of-pipe dischargers. Section 1342. The Clean Water Act prohibits the release of pollutants from point sources except in compliance with an NPDES permit. Section 1311. The Clean Water Act provides that any citizen may bring an action against an agency alleged to be in violation of an effluent limitation. Section 1365(a).

"Water quality standards" are, in general, promulgated by the states and establish the desired condition of the waterway. Section 1313. The EPA provides states with substantial guidance in the drafting of water quality standards, and the states must submit the standards to the EPA for

review and approval. Water quality standards under the Clean Water Act generally consist of three elements: 1) one or more designated "uses" of that waterway; 2) water quality "criteria" specifying the amount of various pollutants that may be present in those waters and still protect the designated uses, expressed in numerical concentration limits or narrative form; and 3) a provision restricting the degradation of certain waters. Sections 1313(c)(2) and 1313(d)(4)(B).

Congress supplemented the "technology-based" effluent limitations with "water quality-based" limitations "so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." *EPA v. California ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 205 n. 12, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).

Dams have been treated by the courts as a nonpoint source under the Clean Water Act and are not subject to NPDES permit requirements. *See* 33 U.S.C. § 1314(f); *National Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 175 (D.C.Cir.1982).

*State of Washington Water Quality Standards*

Pursuant to the provisions of the Clean Water Act, the State of Washington has promulgated the following water quality standards:

1. Water Temperature—The State of Washington has designated the Lower Snake River, throughout its course within the State of Washington, as Class A (excellent) water. WAC 173–201A–130 (98). The general criteria for Class A waters are defined, in part, as follows:

(a) General characteristic. Water quality of this class shall meet or exceed the requirements for all or substantially all uses.

(b) Characteristic uses. Characteristic uses shall include, but not be limited to, the following:

.    .    .    .    .

(iii) Fish and shellfish:

Salmonid migration, rearing, spawning, and harvesting.

Other fish migration, rearing, spawning, and harvesting.

WAC 173–201A–030(2)(a) & (b).

The State of Washington has established a specific temperature standard for the Snake River which mandates that the water temperature shall not exceed twenty degrees Celsius due to human activities. WAC 173–201A–130(98)(a) & (b). In addition, "[w]hen natural conditions exceed 20.0C, no temperature increase will be allowed which will raise the receiving water temperature by greater than 0.3C; nor shall such temperature increases, at any time, exceed $t = 34/(T + 9)$." WAC 173–201A–130(98)(a).

2. Dissolved Gas—The State of Washington has established a water quality criterion for dissolved gas of "110 percent of saturation at any point of sample collection" for Class A waters. WAC 173–201A–030(2)(c)(iii). The State of Washington has granted the National Marine Fisheries Service a specific, temporary waiver of this standard in order to aid in fish passage. The National Marine Fisheries Service 1995 Biological Opinion set maximum levels of dissolved nitrogen at 12 hour averages of 115% (or an instantaneous level of 120%) at dam forebays, the area of water immediately behind the dam, and 129% of saturation (or instantaneous level of 125%) at dam tailraces, the area of water immediately below the dam.

3. Antidegradation Policy—The antidegradation policy of the State of Washington requires that "[e]xisting beneficial uses shall be maintained and protected and no further degradation which would interfere with or become injurious to existing beneficial uses shall be allowed." WAC 173–201A–070(1).

*The Corps Policy*

The policy of the Corps is "to comply with water quality standards to the extent practicable" regarding nationwide operation of water resources projects. Declara-

**1076**

tion of David J. Ponganis in Support of Defendant U.S. Army Corps' Response to Plaintiffs' Motion for Summary Judgment and Defendant's Cross–Motion for Summary Judgment, p. 3. General policies of the Corps are summarized in the Corps' *Digest of Water Resources Policies and Authorities,* Engineering Pamphlet 1165–2–1, dated February 15, 1996. Specifically, the Digest states:

> Although water quality legislation does not require permits for discharges from reservoirs, downstream water quality standards should be met whenever possible. When releases are found to be incompatible with state standards they should be studied to establish an appropriate course of action for upgrading release quality, for the opportunity to improve water quality in support of ecosystem restoration, or for otherwise meeting their potential to best serve downstream water quality needs. Any physical or operational modification to a project (for purposes other than water quality) shall not degrade water quality in the reservoir or project discharges.

Digest, p. 18–5, § 18–3.b (Attachment 1 to Ponganis Declaration).

*National Marine Fisheries Service 1995 Biological Opinion*

On March 2, 1995, the National Marine Fisheries Service issued an "Endangered Species Act—Section 7 Biological Opinion; Reinitiation of Consultation on 1994–1998 Operation of the Federal Columbia River Power System and Juvenile Transportation Program" (hereinafter referred to as the "1995 BiOp"). This 1995 BiOp was intended to constitute a substantial step in a coordinated effort on behalf of the federal government to halt and reverse the declines of endangered Snake River salmon stocks and other declining Pacific salmon stocks.

The 1995 BiOp states that "NMFS has estimated that of the ten million historical losses of salmon and steelhead, eight million, or 80%, is attributable to hydropower development and operation." Declaration of Kristen L. Boyles in Support of Plain-

tiffs' Motion for Summary Judgment, Exh. 1, p. 4. The 1995 BiOp explains:

> [R]educed flow through reservoirs has contributed to the decline of all three listed species of Snake River salmon. Slow passage through reservoirs increases the exposure time of juvenile salmon to predation, to higher temperatures (which increase the predation rate and susceptibility of salmon to disease), and to water quality problems such as dissolved gas supersaturation, which can sometimes occur as a result of project operations.

*Id.* at 38.

The 1995 BiOp concluded that the proposed Federal Columbia River Power System Operations would jeopardize listed Snake River spring/summer and fall chinook and Snake River sockeye salmon. Based upon this jeopardy finding, the 1995 BiOp included a "Reasonable and Prudent Alternative" calling for specific spill for fish regimes in the Lower Snake and Columbia Rivers, which the National Marine Fisheries Service concluded would avoid jeopardy if followed.

*The Corps 1995 Record of Decision*

On March 10, 1995, the Corps issued a "Record of Decision; Reservoir Regulation and Project Operation; 1995 and Future Years" documenting the decision of the Corps to implement existing and modified plans related to reservoir regulation and project operation for Corps projects, including the Lower Granite, Little Goose, Lower Monumental and Ice Harbor. This 1995 Record of Decision adopted the Federal Columbia River Power System Operations 1995 BiOp, and the Reasonable and Prudent Alternative measures contained therein which include immediate, intermediate and long-term actions concerning the operation and configuration of the Federal Columbia River Power System. The 1995 Record of Decision requires the Corps to adjust the spill water over the dams in the Snake River in order to increase fish passage efficiency and survival at those dams.

The 1995 Record of Decision stated, in part:

### Water Quality

The RPA [Reasonable and Prudent Alternative] proposes spill for juvenile salmon at all eight mainstem projects on the lower Snake and Columbia Rivers. The RPA includes spill to achieve 80 percent fish passage efficiency (FPE) for salmon at all projects, except that spill at Lower Granite, Little Goose and Lower Monumental would be based on Snake River flows i.e., more juveniles would be transported in low flow conditions and less juveniles in higher flow conditions. Spill would also be subject to a TDG [Total Dissolved Gas] limit. NMFS, in their RPA, indicated this TDG limit should be either 115 percent measured at the forebay or the state water quality standard of 110 percent. Also included in the RPA is a comprehensive monitoring and evaluation program which would provide real-time information on physical and biological parameters so that spill adjustments can be made.

Spill at Dworshak occurred in past years in order to meet salmon flow objectives. Voluntary spill at Dworshak will produce TDG levels that exceed the state water quality standard of 110 percent. The Corps expressed concerns about exceeding current state water quality standards in the Supplemental Biological Assessment. Also, in a letter dated November 9, 1994, from Major General Ernest J. Harrell (Corps) to Federal agencies, the states, and other regional interests he indicated the Corps would attempt to adhere to the state water quality standards, in so far as physically possible, in operating its projects, and that requests to exceed state standards should be fully coordinated with the appropriate states by the requesting agency.

At the time of the signing of the ROD, it is the Corps' understanding that the proposed spill which would exceed current state standards is being discussed by NMFS with the appropriate state agencies. Also, it is the Corps' understanding that a plan for the monitoring and evaluation program is scheduled to be completed by NMFS on March 10, 1995. The Corps is prepared to implement spill if the appropriate coordination with water quality agencies has been completed and an adequate monitoring and evaluation program is operational prior to implementation.

Boyles Declaration, Exh. 6, p. 12.

The 1995 Record of Decision discusses state water quality standards but does not refer to the requirements of the Clean Water Act.

### American Rivers Litigation

On March 14, 1996, a group of environmental organizations filed an action under the Endangered Species Act and the Administrative Procedures Act challenging the 1995 BiOp and the 1995 Record of Decision for the Federal Columbia River Power System Operations. *American Rivers v. National Marine Fisheries Service,* Civil No. 96–384–MA (hereinafter referred to as *"American Rivers II").* The plaintiffs in *American Rivers II* included all of the plaintiffs in the case currently before this court, with the exception of the National Wildlife Federation, the Washington Wildlife Federation, and the Idaho Wildlife Federation. The plaintiffs in *American Rivers II* asserted that the 1995 BiOp and the 1995 Record of Decision failed to provide a rational explanation for the conclusion that the operations of the Federal Columbia River Power System under the Reasonable and Prudent Alternative would avoid jeopardy to listed Snake River chinook and sockeye salmon in violation of the requirements of the Endangered Species Act.

On April 3, 1997, United States District Judge Malcolm F. Marsh filed an Opinion and Order finding in favor of the defendants and against the plaintiffs. Judge Marsh concluded that the plaintiffs failed to identify any violations of the Endangered Species Act relative to the defendants' operation of the Federal Columbia

River Power System under the 1995 BiOp and the 1995 Record of Decision. *American Rivers v. National Marine Fisheries Service,* Civil No. 96–384 MA (D.Or.).

*National Marine Fisheries Service 1998 Supplemental Biological Opinion*

On May 14, 1998, the National Marine Fisheries Service issued a "Supplemental Biological Opinion" on the "Operation of the Federal Columbia River Power System" and the "Juvenile Fish Transportation Program" (hereinafter referred to as the "1998 BiOp"). Boyles Declaration, Exh. 5.

*The Corps 1998 Record of Decision*

On June 24, 1998, the Corps issued a "Record of Consultation and Summary of Decision: Federal Columbia River Power System Operations and System Configuration" which "adopt[ed], incorporat[ed], and reaffirm[ed] the [1995] Record of Decision (ROD)." Boyles Declaration, Exh. 7. This record of consultation and summary of decision documented the decision of the Corps to implement certain operations and action related to the operation and configuration of the projects of the Federal Columbia River Power System, including the Ice Harbor, Lower Monumental, Little Goose, and Lower Granite. The 1998 Record of Decision explains the operations as follows:

> The operations described below support recovery of ESA-listed species as outlined in the NMFS' and USFWS' 1995 Biological Opinions, specifically the Reasonable and Prudent Alternative and the Incidental Take Statement contained in these documents, and the 1998 Supplemental Biological Opinion. Further, it is consistent with the Juvenile Fish Transportation Program contained in the Section 10 permit issued to the Corps for that activity by NMFS.
> The operation adopts the adaptive management approach. Under this approach, operations may be modified in-season and/or year-to-year based upon new scientific information or to support studies for long-term configuration changes through the RPA 26 framework

process. The regional forum provides for discussions and procedures to assist in decisions on modifications of measures. A Technical Management Team will make in-season recommendations to the Corps based on runoff conditions, fish migration and other factors. There are also various regional groups within the forum, such as the Implementation Team, where system operations are proposed and discussed. The Corps will continue to coordinate through the regional forum with NMFS, USFWS, NPPC, states, and Tribes on different proposed reservoir operations in the regional forum TMT process and consider TMT recommendations in making final decisions on the operation of Corps projects....

Boyles Declaration, Exh. 7, p. 9.

The 1998 Record of Decision references spill on the lower Snake River dams which would exceed state water quality standards but does not refer to the requirements of the Clean Water Act. *Id.* at p. 10.

*1998 Water Management Plan*

On July 30, 1998, the "Water Management Plan for the Federal Columbia River Power System" was prepared by the Technical Management Team of the National Marine Fisheries Service Regional Forum. The 1998 Water Management Plan addressed the issue of water temperature, stating:

> Water quality standards have been developed by the states and tribes under the authority of the federal Clean Water Act to restore and maintain the chemical, physical, and biological integrity of the waters of the United States. High water temperature is a basin-wide issue involving tributaries and mainstem watercourses and impoundments. The TMT recognizes that water temperature is important to the survival of fish and other aquatic life forms, and will recommend that every effort be made to meet

the state and tribal water quality standards in the mainstem.

Boyles Declaration, Exh. 8, p. 18, § XII.

The 1995 BiOp called for the establishment of a Technical Management Team to advise the operating agencies on dam and reservoir operations to optimize passage conditions for juvenile and adult anadromous salmonids. Each year the Technical Management Team develops an annual water and management plan to describe expected operations at projects in the Federal Columbia River Power System for the upcoming year based upon run-off and weather forecast information. Actual recommendations regarding operations may deviate slightly from the Water Management Plan as the Technical Management Team attempts to match available water flow to fish migration. *See* Declaration of Cynthia A. Henriksen in Support of Defendant U.S. Army Corps' Response to Plaintiffs' Motion for Summary Judgment and Defendant's Cross–Motion for Summary Judgment, p. 11, ¶ 22.

*Monitoring Program*

The Corps monitors water temperatures and total dissolved gas on a continuous basis on the Lower Snake River, including sites at the four dams involved in this case. Henriksen Declaration, pp. 12–13, ¶ 24. The main objective of the monitoring program is to collect the total dissolved gas data needed to adjust the spill at Columbia/Snake River mainstem dams; and monitor project performances in relation to water quality standards. The Corps recognizes that high total dissolved gas levels can cause physiological conditions harmful to fish, and that water temperatures significantly influence the health of fish and other aquatic species. *Id.* at p.13, ¶ 25.

In recent years, instream temperatures have exceeded water quality standards on a regular basis during the summer months. *See* Declaration of John McKern in Support of Defendant U.S. Army Corps' Response to Plaintiffs' Motion for Summary Judgment and Defendant's Cross–Motion for Summary Judgment, pp. 6–7,

¶ 13. The data collected by the Corps shows that the dissolved gas levels at the forebay and the tailrace of each of the four lower Snake River dams exceeds water quality standards and the waiver of water quality standards on a number of days each year. Henriksen Declaration, pp. 16–17, ¶¶ 31–33.

The existence and operation of the four dams has an influence on temperature and total dissolved gases in the Lower Snake River. Boyles Declaration, Exh. 1, p. 38 (1995 BiOp). There is considerable dispute as to how significant this influence is and whether the Corps can further alter this influence through the operation of the four lower Snake River dams. *Compare* Declaration of David L. Wegner in Support of Plaintiffs' Motion for Summary Judgment *with* Declaration of John McKern in Support of Defendant U.S. Army Corps' Response to Plaintiffs' Motion for Summary Judgment and Defendant's Cross–Motion for Summary Judgment.

### CONTENTIONS OF THE PLAINTIFFS

The plaintiffs contend that the decisions made and the actions taken by the Corps regarding the operation of the four lower Snake River dams cause violations of each component of the water quality standards for the State of Washington, as follows: 1) the numeric standard for water temperature and dissolved gas which protect the river's designated uses; 2) the narrative criteria for Washington's Class A waters; and 3) the antidegradation standard for the State of Washington.

The plaintiffs contend that the Corps' operation of the four lower Snake River dams causes water temperature in the river to increase above twenty degrees Celsius to a greater extent and on a greater number of days in violation of water quality standards and increase dissolved gas to levels greater than the 110%, 115%, 120% and 125% thresholds in violation of water quality standards. The plaintiffs contend that these continuing violations of water

quality standards and the Clean Water Act cause irreparable harm to fish and the aquatic ecosystem of the Snake River.

The plaintiffs contend that this court has jurisdiction under the Administrative Procedures Act to review the final agency actions of the Corps contained in the 1995 Record of Decision and the 1998 Record of Decision. The plaintiffs contend that a clear line of decisions by the United States Court of Appeals for the Ninth Circuit confirms that this action is justiciable under the Clean Water Act and the Administrative Procedures Act. The plaintiffs contend that they have standing to bring this action, and that their claims are not barred by claim or issue preclusion.

## CONTENTIONS OF THE DEFENDANTS

The Corps and the intervenor-defendants seek judgment in their favor on jurisdictional grounds and contend that the presence of factual disputes precludes summary judgment in favor of the plaintiffs on the merits. The Corps and the intervenor-defendants contend that 1) the doctrine of issue preclusion and claim preclusion bar this action; 2) the plaintiffs' claim for violation of state water quality standards is barred by 33 U.S.C. § 1323; 3) the plaintiffs lack standing to sue; 4) the plaintiffs have not identified any final agency action reviewable under the Administrative Procedures Act; and 5) the merits of the plaintiffs' claims cannot be decided without reference to the administrative record supporting the Record of Decisions in this case.

The Corps contends that there is no factual basis to support the plaintiffs' conclusion that the Corps' operation of the dams, as opposed to the mere existence of the dams, causes violations of state water quality standards.

## ANALYSIS

A. *Claim Preclusion and Issue Preclusion*

The Corps and the defendant-intervenors contend that the doctrines of claim preclusion and issue preclusion bar the plaintiffs from asserting any further challenge to the decision contained in the 1995 Record of Decision. The Corps contends that the law does not allow the plaintiffs to attempt to litigate any issues that they could have and should have brought in *American Rivers II*. The Corps and the defendant-intervenors concede that the Clean Water Act claim raised in this case was not raised in *American Rivers II*. However, the Corps and the defendant-intervenors contend that the Clean Water Act claim in this case is barred on the grounds that the claim could have and should have been raised in *American Rivers II*.

The plaintiffs contend that claim preclusion and issue preclusion do not bar this action because the plaintiffs are not the same as the plaintiffs in *American Rivers II* and the claim asserted in this case is not the same claim. In addition, the plaintiffs contend that the Clean Water Act claim involving the 1998 Record of Decision could not have been raised in *American Rivers II* because the 1998 Record of Decision did not exist at the time that Judge Marsh decided *American Rivers II*.

Claim preclusion may be asserted against a party in a previous action or in privity with a party involved in a previous action. *In re Imperial Corp. of Am.*, 92 F.3d 1503, 1506 (9th Cir.1996). Three of the plaintiffs in this case did not participate in any of the *American Rivers II* litigation. These non-parties cannot be bound by the prior decision, even if the claim was the same. *See Earth First v. Block*, 569 F.Supp. 415, 421 (D.Or.1983). The claim under the Clean Water Act in this case is not the same as the claim under the Endangered Species Act in *American Rivers II*. In *American Rivers II*, the court determined that the 1995 Record of Decision did not violate the Endangered Species Act. The litigation did not involve or address compliance with the Clean Water Act. The 1998 Record of Decision did not exist when Judge Marsh

decided *American Rivers II* and could not have been brought in the prior action.

■ Issue preclusion prevents relitigation of all "issues of fact or law that were actually litigated and necessarily decided" in prior proceedings. *Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir. 1988) (quoting *Segal v. American Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir.1979)). The Endangered Species Act and the Clean Water Act are two distinct statutory schemes. Compliance with one statute does not equal compliance with the other. *See Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 302 (9th Cir.1991). The claim in this case, that the actions of the Corps in the 1995 Record of Decision and the 1998 Record of Decision violate the Clean Water Act, was not actually litigated or necessarily decided in the *American Rivers II* case. Neither the doctrine of claim preclusion nor issue preclusion bars this action.

**B. *Private Enforcement of the State Water Quality Standards***

The Corps and the defendant-intervenors contend that the plaintiffs are not entitled to bring this proceedings for judicial review under the Administrative Procedures Act to prevent a federal agency from violating the Clean Water Act. The plaintiffs contend that controlling authority in this circuit holds that judicial review under the Administrative Procedures Act is available to the plaintiffs to enforce state water quality standards against federal agencies.

In *Oregon Natural Resources Council v. United States Forest Service*, 834 F.2d 842 (9th Cir.1987), the plaintiff environmental organization brought an action challenging the decision of the United States Forest Service to approve the reoffer of a timber sale to a timber company. The plaintiff alleged, among other claims, that the construction of a bridge and a logging road would violate the Clean Water Act and Oregon water quality standards enforceable under the Clean Water Act. The United States Court of Appeals for the Ninth Circuit held that citizens may not enforce

water quality standards not included in an NPDES permit under the citizen enforcement provision of the Clean Water Act, 33 U.S.C. § 1365, but concluded that judicial review was available under the Administrative Procedures Act. The court stated:

[I]n *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), the Supreme Court held that "judicial review of final agency action by an aggrieved person will not be cut off unless there is a persuasive reason to believe that such specifically was the purpose of Congress." We conclude that by creating a section of the [Clean Water] Act specifically addressing nonpoint sources Congress did not intend to cut off review, but intended to protect the interests of persons aggrieved by nonpoint source violations of state water quality standards. Judicial review under the APA is therefore "ordinarily inferred" and appropriate.

834 F.2d at 851 (footnote omitted).

In *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146 (9th Cir.1998), the court concluded that judicial review under the Administrative Procedures Act was available to the plaintiffs to challenge a timber sale by the United States Forest Service on the grounds that the sale would cause nonpoint source pollution in violation of Idaho water quality standards and the Clean Water Act. The court stated:

Under the Clean Water Act, all federal agencies must comply with state water quality standards, including a state's antidegradation policy. 33 U.S.C. § 1323(a). Judicial review of this requirement is available under the Administrative Procedure Act. *Oregon Natural Resources Council v. United States Forest Service*, 834 F.2d 842, 852 (9th Cir. 1987).

137 F.3d at 1153.

■ The Corps and the defendant-intervenors contend that the holdings in *Oregon Natural Resources Council* and *Idaho Sporting Congress* are altered by their assertion that state water quality stan-

dards are not subject to private enforcement and by their reference to 33 U.S.C. § 1323(a), which provides that federal agencies shall be subject to state requirement respecting the control and abatement of water pollution "in the same manner, and to the same extent as any nongovernmental entity." This court concludes that the United States Court of Appeals for the Ninth Circuit has ruled directly contrary to the position of the Corps and the defendant-intervenors in *Oregon Natural Resources Council* and in *Idaho Sporting Congress.* The United States Court of Appeals for the Ninth Circuit has held that judicial review of the requirement that all federal agencies must comply with state water quality standards is available under the Administrative Procedures Act. This court must follow that ruling. Judicial review of the plaintiffs' claim that the Corps is violating the Clean Water Act by not complying with the water quality standards of the State of Washington is proper under the Administrative Procedures Act.

## C. *Final Agency Action*

The Corps and the intervenor-defendants contend that the plaintiffs do not identify any part of the 1995 Record of Decision or the 1998 Record of Decision that cause the alleged violations of water quality standards. The defendants contend that the decision to construct a system of Columbia River dams was made by Congress beginning in the 1930's, and any review under the Administrative Procedures Act must be limited to current decisions made by the Corps which result in alleged violations of water quality standards.

The plaintiffs contend that the decisions and the final actions of the Corps in the 1995 Record of Decision, the 1998 Record of Decision, and the 1998 Water Management Plan violate state water quality standards and the Clean Water Act. In the alternative, the plaintiffs contend that the failure to take action at the four lower Snake River projects to meet state water quality standards is reviewable inaction that violates the Clean Water Act.

The complaint filed by the plaintiffs identifies the challenged final agency actions as "The Corps' 1995 [Record of Decision];" "The Corps' 1998 [Record of Decision];" and "the Corps' 1998 Water Management Plan." Complaint, p. 19, ¶¶ 51, 52 and 53. The Corps concedes that the 1995 Record of Decision and the 1998 Record of Decision dictate the operation of the dams, but argues that the plaintiffs have failed to identify the decision made, in the 1995 Record of Decision and the 1998 Record of Decision, that caused the alleged violations of water quality standards.

The 1995 Record of Decision and the 1998 Record of Decision detail agency actions concerning the operation of the four lower Snake River dams. The 1995 Record of Decision and the 1998 Record of Decision specifically address and make decisions directly related to the issues of water temperature, total dissolved gases, and compliance with state water quality standards on the Lower Snake River. There is evidence in these documents that the agency actions regarding the operation of the dams directly effect the alleged violations of water quality standards with regard to temperature and total dissolved gas on the Lower Snake River. *See* 1995 Record of Decision, Boyles Declaration, Exh. 6, p. 12 & p. 19; 1998 Record of Decision, Boyles Declaration, Exh. 7, pp. 10–11. The Attorney General of the State of Oregon states in the Brief of the State of Oregon as Amicus Curiae:

The Corps well understands—indeed, it is beyond dispute—that the dams in question are responsible for violation of water quality standards with regard to temperature and total dissolved gas on the Lower Snake River. Similarly, the Corps well understands the critical importance of those water quality standards for the protection of designated beneficial uses of water bodies in Oregon and Washington, most particularly the survival of threatened and endan-

gered Snake River salmon and steelhead populations.

Brief of the State of Oregon as Amicus Curiae, p. 1.

■ The court finds that the Corps' 1995 Record of Decision and the Corps' 1998 Record of Decision are final agency actions which are subject to judicial review under the Administrative Procedures Act. 5 U.S.C. §§ 701–706. The court finds that the 1998 Water Management Plan is not a final agency action subject to review under the APA because it is prepared by the Technical Management Team of the National Marine Fisheries Service Regional Forum. The 1998 Record of Decision states that the Corps "consider[s] TMT recommendations in making final decisions on the operation of Corps projects." Boyles Declaration, Exh. 7, p. 9. While the final decision of the Corps is subject to judicial review, the recommendations considered in making the final decision are not.

#### D. Standing to Sue—Aggrieved Person

The Corps and the defendant-intervenors contend that the plaintiffs have failed to establish standing to sue under the Administrative Procedures Act because the plaintiffs have not provided evidence of specific concrete facts of demonstrable, particularized injury from the challenged decision. The defendants contend that the plaintiffs' conclusions that operation of the dams is harmful to salmon, and that the relief sought in this case will help salmon recovery, are without evidentiary support in the affidavits.

■ The United States Supreme Court has held that the plaintiffs must establish three elements to demonstrate standing: 1) "injury in fact;" 2) that the injury is fairly traceable to the challenged action taken by the Corps; and 3) that it is likely the injury will be redressed through a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351(1992).

■ The declarations submitted by the plaintiffs demonstrate that members of the plaintiff organizations regularly use and have an interest in using the Lower Snake River for recreation, including fishing, aesthetic and spiritual experiences, and that these interests are injured by the decline in salmon and steelhead. There is evidence in this case to adequately demonstrate that the injury to these recreational, aesthetic, spiritual and commercial interests are fairly traceable to the alleged actions of the Corps in operating the four lower Snake River dams in violation of water quality standards. There is evidence to adequately demonstrate that an order of this court requiring the Corps to comply with water quality standards in the operations of the dams at issue would have a significant impact upon the complained of injury. The plaintiffs have established standing to pursue their claim against the Corps.

#### E. The Merits and the Administrative Record

The plaintiffs allege that the 1995 Record of Decision and the 1998 Record of Decision by the Corps violate the Clean Water Act because these final agency actions fail to assure that the dams will operate in compliance with state water quality standards. The United States Court of Appeals for the Ninth Circuit has stated that "[u]nder the Clean Water Act, all federal agencies must comply with state water quality standards." Idaho Sporting Congress, 137 F.3d at 1153. The plaintiffs are entitled to challenge alleged violations of the state water quality standards pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 701–706. Oregon Natural Resources Council, 834 F.2d at 850–52.

The Administrative Procedures Act provides, in part, that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. This court must determine whether the actions of the Corps were "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). In determining whether the Corps' decisions in the 1995 Record of Decision and the 1998 Record of Decision regarding the operation of the dams were arbitrary and capricious, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851. The court must consider all of the relevant factors and all of the relevant laws in deciding whether the administrative record shows that the Corps has met its obligations under the Clean Water Act in the 1995 Record of Decision and the 1998 Record of Decision.

The court concludes that summary judgment on the merits cannot be decided without reference to and reliance upon the administrative record supporting the 1995 Record of Decision and the 1998 Record of Decision. The court will allow a period of ninety days for the parties to review the administrative record and submit all relevant references to the court. The court will allow the parties to file motions for summary judgment thereafter.

### CONCLUSION

The court rules as follows:

1. Plaintiffs' motion for summary judgment (# 36) is denied;

2. Defendant United States Army Corps' cross-motion for summary judgment (# 64) is denied;

3. Intervenor–Defendants Potlatch and NWPPA's motion for summary judgment (# 75) is denied;

4. Intervenor–Defendant Inland Ports and Navigation Group's motion for summary judgment (# 83) is denied;

5. Intervenor–Defendant Columbia River Alliance's motion to make more definite and certain; motion to strike; joinder in motion for summary judgment; and al-

ternative motion for a continuance (# 81) is denied.